## BEDELL v. COMMISSIONER OF INTERNAL REVENUE.

Circuit Court of Appeals, Second Circuit.
February 4, 1929.

### No. 144.

Lyle T. Alverson, of New York City (Adolph Bloch, of New York City, on the brief), for appellant.

Mabel Walker Willebrandt, Asst. Atty. Gen., Dorothy A. Moncure, of Washington, D. C., Morton P. Fisher, of Baltimore, Md., and C. M. Charest and C. Colden Miller, both of Washington, D. C., for appellee.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge (after stating the facts as above). ■ If the transaction of December, 1919, was in fact what it purported to be, the White Oil Company only promised to pay for the delivery of title on February 29, 1920. Even the deposit was in escrow; that is, it was conditional upon the completion of the sale; and nothing whatever was due unless the title passed. Had the Broadway-John Street Company already taken title and paid the price, we do not understand that the appellant maintains that a contract of sale would measure the profit before the time of payment; at any rate it is clear that it would not. While equity regards a vendee before payment as owner, still the payment is for the title, and is conditional on its delivery, as much as in the case of chattels where title has not passed. Of course, it is true that an obligation, even a conditional obligation, is in some sense property, and, like anything else that can be transferred, may be said to have a value, but nevertheless payment is made in exchange for title, and will never be made if it is not conveyed. To speak of the profit as resulting because its amount can be presently ascertained, though performance remains uncertain, seems to us a perversion of language.

If, on the other hand, we abandon the form of the transaction and assume that the contract with the White Oil Company was an assignment of the contract with the Valentine Company, the result is no different, though the assumption is unreal. So viewed, the White Oil Company became the vendee, and upon the passage of title became liable to the Valentine Company for the agreed price, and to the Broadway-John Street Company for the difference between it and the price in its own contract. The White Oil Company did not pay down that difference for an assignment of the contract, taking its risk of performance; on the contrary, even as regards the initial payment, its promise was conditional upon performance by the Valentine Company. It was paying for the title as much as though it was vendee of the Broadway-John Street Company, which in truth it was. For that title it was to pay in part to the Valentine Company and in part to its assignor; it made no difference that performance was not to be made by the assignor.

While, therefore, we do not think that the case is like a promise to pay in the future for a title which passes at the time of contract, we would not be understood as holding by implication that even in that case the profit is to be reckoned as of the time of sale. If a company sells out its plant for a negotiable bond issue payable in the future, the profit may be determined by the present market value of the bonds. But if land or a chattel is sold, and title passes merely upon a promise to pay money at some future date, to speak of the promise as property exchanged for the title appears to us a strained use of language, when calculating profits under the income tax. Section 202 (b) of the Act of 1918 provided for an exchange of property and made the profit depend upon "the amount of its [the property received] fair market value, if any"—a phrase which was amended in the law of 1921 (42 Stat. 227) to "readily realizable market value." There is a difference between the two, but it is absurd to speak of a promise to pay a sum in the future as having a "market value," fair or unfair. Such rights are sold, if at all, only by seeking out a purchaser and higgling with him on the basis of the particular transaction. Even if we could treat the case as an exchange of property, the profit would be realized only when the promise was performed. We agree with the board upon the first point.

■ Upon the second, the evidence is in conflict. The appellant swore that he gave much of his time to trading in stocks, bonds, and real estate, and sought to set off his losses in 1919 against his profits in 1918 and 1920, as provided in section 204 (b). Apparently these losses are not quite the same as those contained in his return for 1919, for the stipulated figures do not tally with them. Whether the stipulated losses include some profits on real estate and negotiable securities we do not know; we have only the record to go on; that is, Bedell's testimony, his return, and the stipulation. In the first place, we are by no means satisfied, even if we were bound by his oral testimony, that it proved him to have been regularly carrying on a "business" of any kind. A trader on an exchange, who makes a living in buying and selling securities or commodities, may be said to carry on a "business"; a person who frequents brokers' offices, and continually dabbles in real estate is conceivably quite different. Most men who have capital change their investments, and may speculate all the time; we should hardly call this a business, though the line is undoubtedly hard to draw. But the board apparently assumed that, if Bedell had shown that he was so engaged during 1919, it would have been enough; it thought that the proof was defective because of his return for that

year. Saving the doubt we have suggested, we are content to dispose of the case on that assumption.

It is of no consequence whether Bedell was bound to file any return at all; he chose to do so, and it was fair to take him at his word when he swore that it was "a true and complete statement" of all his gains. He might have persuaded the board of its incorrectness, for it was only an admission against interest; but he did not succeed, and we have no jurisdiction to review the findings of fact when supported by any evidence. Avery v. Commissioner (C. C. A. 5) 22 F.(2d) 6, 7, 55 A. L. R. 1277; Royal Packing Co. v. Commissioner (C. C. A. 9) 22 F.(2d) 536; Henderson Iron Works v. Commissioner, 58 App. D. C. 114, 25 F.(2d) 538; Blair v. Curran (C. C. A. 1) 24 F.(2d) 390; Bishoff v. Commissioner (C. C. A. 3) 27 F.(2d) 91.

The return shows that he did substantially no "business" of the kind during that year, nothing but to sell the securities which he had held for six years. Although the return was put in evidence on his cross-examination, he made no effort to reconcile its contents with his testimony, and some reconciliation was necessary if his version was to be accepted. Realizing the force of this objection, he insists that, if he regularly carried on the business as he professed in 1918 and in 1920, it was a matter of no moment that in 1919 he was inactive. The discrepancy might indeed have justified the board in disbelieving his whole story, but its finding was limited to the year 1919, and raises the question of law whether a cessation during that year deprived him of the benefit of section 204 (b), though he traded regularly in 1918 or 1920. In any business there will indeed be periods of inactivity, during which it would hardly be true to say that the business was not being "regularly carried on." Such in any case would be plainly true when one was speaking of an ordinary commercial or industrial enterprise. It seems to us, however, impossible to regard the business of buying and selling securities and real estate as having a similar continuity when for a whole year the person supposedly engaged in it does nothing at all or substantially nothing. Assuming that he is ever in a business, while so engaged, he will be in it and out of it as he trades or does not. Here again it is a question of degree, and the length of the intervals will determine the conclusion. An interval of two weeks would scarcely count; but, when for a year he does nothing, it seems to us past reason to speak of the supposititious business as being still carried on.

Finally, the objection is taken that the board found only that he was not dealing in securities, and made no finding as to real estate. The implied argument appears to be that the business was single, and included negotiable securities, mortgages, and real estate, and that, if he continued dealing in real estate, he continued in the "business," though he did nothing in securities. We decline to accept that interpretation of the statute. If he did not deal in securities, his real estate business would not carry his losses in the securities held for six years. It is absurd to speak of such activities collectively as a single business. There is no evidence that the losses stipulated were losses in real estate; so far as appears, they were in securities.

Order affirmed.