*Decisions will be entered under Rule 50.*

GEORGE L. CASTNER COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

GEORGE L. CASTNER AND HIS WIFE, LUCILE C. CASTNER, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 55774, 55775. Filed August 15, 1958.

*George L. Castner,* for the petitioners.
*Miller Bowen, Esq.,* for the respondent.

The respondent determined deficiencies in income tax against the petitioners as follows:

| Docket No. | | Year | Deficiency |
|---|---|---|---|
| 55774 | George L. Castner Company, Inc | 1951 | $341. 66 |
| 55775 | George L. Castner and Lucile C. Castner | 1952. | 831. 32 |

The questions for decision are whether the respondent erred (1) in his determination of the 1951 gain realized by George L. Castner Company, Inc., from the sale of certain machinery and equipment, and (2) in his determination of fair market value of a note George L. Castner received in liquidation of his George L. Castner Company, Inc., stock.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are found as stipulated.

George L. Castner and Lucile C. Castner are husband and wife, and are residents of Clarksville, Tennessee. They filed a joint income tax return for the calendar year 1952 with the district director of internal revenue for Tennessee.

George L. Castner Company, Inc., sometimes hereafter referred to as the Castner Company, was a Tennessee corporation organized on February 16, 1920, under the name of Castner Ice Cream Company, with its principal place of business in Clarksville. It filed its corporation income tax returns for the calendar year 1951 and for the period January 1, 1952, to October 31, 1952, with the district director of internal revenue for Tennessee.

On some undisclosed date in the 1930's, the name of Castner Ice Cream Company was changed to the Clarksville Pure Milk Company. Its business was and continued to be the processing and selling of milk, ice cream, and other related products at wholesale and retail.

Acting for the Clarksville Pure Milk Company, George L. Castner, hereafter referred to as petitioner, on some date not shown, offered to sell the dairy equipment and machinery of the company to the Velvet Ice Cream Company of Nashville, Tennessee. Velvet sent one of its employees, Fletcher Brothers, to Clarksville to evaluate the property and determine if it was feasible for Velvet to make the purchase. After hearing Brothers' report, Velvet indicated that it was not interested in making the purchase. Brothers later returned to Clarksville and offered personally to buy the property, but at a price much less than petitioner wanted Velvet to pay. After discussing the proposal with Brothers and J. W. Burklow, a friend of Brothers', petitioner negotiated an agreement, evidenced by written contract dated May 7, 1951, for sale of the property to Brothers and Burklow.

On the date of the contract, the Clarksville Pure Milk Company had outstanding 126 shares of stock, having a par value of $100 per share. The stock was owned, 82 shares by petitioner, 21 shares by his brother, R. J. Castner, 22 shares by his sister, Mrs. F. W. Walker, and 1 share by Clara E. Seale. On April 28, 1951, petitioner had purchased 3 shares of stock from the Clarksville Ice & Coal Company for $200.

The contract of May 7, 1951, between the Clarksville Pure Milk Company, as seller, and Fletcher Brothers and J. W. Burklow, as purchasers, was designated as a "Contract for Lease of Real Estate and Sale of Personal Property." Under its terms, the seller sold its dairy machinery and equipment, a list of which was attached to the agreement, and leased the property on which it had been conducting its dairy business to the purchasers. The purchase price of the property sold was $11,000, of which the purchasers paid $3,000 as "earnest money." The balance of $8,000 was to be paid in quarterly installments over a 10-year period, the first installment to be due on or before August 10, 1951. Interest was to be paid at the rate of 5 per cent per annum. A vendor's lien was retained by the seller. By the terms of the contract, the sale was to be completed, the note for the balance of the purchase price executed and possession given on May 7, 1951, at the office of the seller.

Under the terms of the contract, the seller agreed that upon completion of the sale, it would, on May 7, 1951, lease the described real estate to the purchasers for a period of 3 years, at a rental of $75 per month, with an option in the purchasers to further lease the property for a like period, and with the right also to purchase the property for $7,500.

Added to the contract as originally written and signed, was a provision, separately signed, that the seller agreed to amend its charter changing its name so as to give "the purchaser" the right to use the name Clarksville Pure Milk Co., Inc.

On May 7, 1951, the date of the contract, the Clarksville Pure Milk Company changed its corporate name to George L. Castner Company, Inc. On the same date, Fletcher Brothers and J. W. Burklow organized Clarksville Pure Milk Company, Inc., and transferred to it the property they had acquired that day from the Clarksville Pure Milk Company.

Pursuant to the contract, and also on May 7, 1951, a note was executed by the Clarksville Pure Milk Company, Inc., to the George L. Castner Company, Inc., in the amount of $8,000. The note recited that the $8,000 was to be paid in quarterly installments of $253.08, beginning on August 10, 1951, and extending over a period of 10 years, or until the entire balance of the principal amount of $8,000 had been paid, with each quarterly installment consisting of both principal and

interest.[1] It was further recited that the note was "secured by a vendor's lien on the property conveyed to Fletcher Brothers and J. W. Burklow by bill of sale, and subsequently transferred by the said Fletcher Brothers and J. W. Burklow, to the Clarksville Pure Milk Company, Inc." There was a provision that any number of the installments or the entire balance due on the principal could be paid at any time.

Attached to the note was a chattel mortgage executed by the Clarksville Pure Milk Company, Inc., by Fletcher Brothers, president, in favor of George L. Castner and wife, Lucile Castner, as trustees. The property mortgaged was the dairy machinery and equipment described in the bill of sale. There were similar provisions with respect to the quarterly installments and the right of paying any number of the installments on or before maturity as were stated on the face of the note.

The seller's adjusted basis for the dairy machinery and equipment on the date of sale was $9,287.19.

At or about the date of the purchase of the machinery and equipment, but in a separate transaction, the purchasers also bought the milk and ice cream and packaging material which Castner Company had on hand, the amount thereof and the price paid not being shown.

On its corporate income tax return for 1951, the Castner Company computed and reported its profits from its operations by the use of inventories, although the return carried a check mark to the effect that it was prepared on a cash basis.

During 1951 and in addition to the $3,000 received on May 7, the contract date, the Castner Company received payment in August and November of two quarterly installments on the note. Of the quarterly payments of $253.08 each, it treated $53.08 as interest and $200 as principal.

On its 1951 return, the Castner Company reported net long-term capital gain of $529.41 from the sale of its machinery and equipment on May 7 of that year. The machinery and equipment was shown as having been acquired in "1945–50." $3,400 was reported as the gross sales price and $2,870.59, described as book value, was shown as the basis. The $3,400 so reported consisted of the $3,000 received on the date of sale and the $400 of principal received on payment of the August and November installments on the note. The $2,870.59 shown as the basis was that part of the total basis of the machinery and equipment that $3,400 bore to the total selling price of $11,000, or 30.9 per cent. This method of reporting the payments received in 1951 on the sale of the machinery and equipment was intended as a reporting of the gain from the said sale on the installment basis.

---

[1] The exact amount of the final installment is not definitely shown. The petitioner had it calculated as $206.48, while the purchasers listed it as $177.45.

The respondent in his determination of deficiency included $1,712.81 representing the entire gain on the sale of the machinery and equipment, namely, the difference between $11,000, the selling price, and $9,287.19, the adjusted basis, as 1951 income. In his computation of the deficiency the said gain was considered as gain from the sale of capital assets.

On October 25, 1952, the Castner Company board of directors adopted a resolution that the corporation be dissolved, and petitioner was empowered to bring about its dissolution. The liquidation had been completed at October 31, 1952.

For purposes of the liquidation, the stockholders of the Castner Company had agreed that the value of its outstanding stock was $132 per share.[2] They also agreed on a value of $3,000 for the note which had been received on the sale of the dairy machinery and equipment and on which, at the time of liquidation, $7,000 was still owing on the principal. Petitioner agreed to accept the note at the value agreed upon as part of the assets to be received by him in the liquidation of his stock. Adding $3.85 as representing 5 per cent "interest" on $132 "for a period of seven months," the petitioner issued checks to his brother, R. J. Castner, his sister, Mrs. F. W. Walker, and Clara E. Seale for amounts representing $135.85 per share of Castner Company stock owned by them. The check for R. J. Castner's stock at $132 per share had previously been issued under date of June 12, 1952, and at October 28, 1952, he was issued a further check for $80.85 to bring the total of the amount received by him on his stock up to $135.85 per share. The payments made to R. J. Castner, Mrs. Walker, and Clara E. Seale in liquidation and the dates of the checks issued were as follows:

| | Number of shares | Amount | Date of check |
|---|---|---|---|
| R. J. Castner | 21 | $2,772.00 | June 12, 1952 |
| R. J. Castner | | 80.85 | Oct. 28, 1952 |
| Clara E. Seale | 1 | 135.85 | Oct. 28, 1952 |
| Mrs. F. W. Walker | 22 | 2,988.70 | Oct. 31, 1952 |
| | 44 | 5,977.40 | |

Instead of showing the payments made to the above stockholders as payments in liquidation, petitioner made entries on the Castner Company books as indicating that he personally had bought the shares of stock in question and at the time of liquidation of the company was its sole stockholder, owning the entire 126 shares which had been outstanding. When the entries were made on the company books there was a credit balance in petitioner's personal account on the books of $2,549.63. He charged this amount with the entire

---

[2] Presumably this was some months, possibly 7, prior to the actual date of liquidation.

$5,977.40 which had been paid to the three other stockholders, resulting in a change in his personal account from a credit balance of $2,549.63 to a debit balance of $3,427.77. On October 30, 1952, petitioner received all of the remaining assets of the Castner Company in liquidation of his 82 shares of Castner Company stock. The assets so received consisted of a savings account of $5,500, United States savings bonds of $3,000, real estate at $2,500, and the machinery and equipment note at the agreed value of $3,000.

On the joint return filed by the petitioners for the calendar year 1952, petitioner reported long-term capital gain on his 82 shares of stock of the Castner Company of $3,241.42, and short-term capital gain of $108.24. This latter amount resulted in some manner from the method in which the payments in liquidation of the 44 shares of stock belonging to the other three stockholders had been handled.

At or about the time of liquidation of the Castner Company, some attempts were made to sell or discount the note which had been received upon the sale of the machinery and equipment in May of 1951, and on which $7,000 was still owing on principal. These efforts were unsuccessful.

At the date of the Castner Company liquidation the Clarksville Pure Milk Company, Inc., the maker of the note, had attained a good credit rating. All of the payments on the note which had become due had been paid, and none of the payments had ever been delinquent. Some of the collateral was later sold, with petitioner's consent, and the receipts were applied in satisfaction of the installments which were to be the last to become due. At the date of the trial herein, only two installments remained to be paid and if paid by their due dates the entire note would be paid off by May 10, 1958, 3 years prior to the end of the 10-year period in which the note, by its terms, was to have been paid.

The respondent in his determination of deficiency against petitioners George L. Castner and Lucile C. Castner determined that at the time of liquidation of the Castner Company and the distribution of the note of the Clarksville Pure Milk Company, Inc., in redemption of George L. Castner's shares of stock, the said note had a fair market value of $7,000, instead of $3,000, as petitioners had reported in making their 1952 income tax return. He also determined that the petitioner had received an informal dividend of $3,427.77 from the Castner Company, which amount represented the debit balance in petitioner's personal account on the Castner Company books after that account had been charged with the entire $5,977.40 which had been paid to the three other stockholders of the company in liquidation of their stock.

OPINION.

TURNER, *Judge:* In section 42 (a) of the Internal Revenue Code of 1939, it is provided that all items of gross income are to be included in gross income for the taxable year in which received, unless under methods of accounting permitted under section 41, any such amounts are properly to be accounted for as of a different period. According to section 41, net income is to be computed upon the basis of the taxpayer's annual accounting period, fiscal or calendar year, "in accordance with the method of accounting regularly employed in keeping the books" of the taxpayer; provided, of course, it clearly reflects the income, in which case "it is to be followed with respect to the time as of which items of gross income and deductions are to be accounted for." Sec. 29.41–1, Regs. 111. And while "approved standard methods of accounting will ordinarily be regarded as clearly reflecting income," the method used must be such that "all items of gross income and all deductions are treated with consistency," and "in any case in which it is necessary to use an inventory, no method of accounting in regard to purchases and sales will correctly reflect income except an accrual method." Sec. 29.41–2, Regs. 111.

In section 44 (b) of the Code, however, it is provided that in "the case (1) of a casual sale * * * of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year), for a price exceeding $1,000, or (2) of a sale or other disposition of real property, if in either case the initial payments do not exceed 30 per centum of the selling price, * * * the income may, under regulations prescribed * * * be returned on the basis and in the manner" prescribed in section 44 (a) for the return of income from sales of personal property regularly made on the installment plan. Under the installment plan of reporting income, a taxpayer is permitted to return as the income from an installment sale in any taxable year "that proportion of the installment payments actually received in that year which the gross profit realized or to be realized when payment is completed, bears to the total contract price." As used in section 44 (b), "the term 'initial payments' means the payments received in cash or property other than evidences of indebtedness of the purchaser during the taxable period in which the sale * * * is made."

Although section 44, *supra,* contains no provision covering the reporting of the gain from sales which are not installment sales under section 44 (a), or the reporting of gain from casual sales of personal property or from sales of real property where in either case the initial payments exceed 30 per cent of the selling price, the respondent has

nevertheless promulgated section 29.44-4 in his said Regulations 111, entitled "Deferred-Payment Sale of Real Property Not on Installment Plan," specifically covering the reporting of gain from sales of real property where some of the payments are deferred but the payments made during the taxable year exceed 30 per cent of the selling price. For the reporting of the gain from such sales, the regulation provides that the obligations of the purchaser received by the vendor are to be considered as the equivalent of cash to the extent of their fair market value, but if the said obligations received have no fair market value, the payments in cash or other property having a fair market value are to be applied against and reduce the basis of the property sold, and if in excess of such basis, are taxable to the extent of such excess.

There is no regulation carrying a similar provision with respect to casual sales of personal property, wherein the payments in cash or property other than evidences of indebtedness of the purchaser received during the year in which the sale is made exceed 30 per cent of the selling price, and under the provisions of section 41, it would thus appear that a taxpayer making such a casual sale of personal property would be required to report the results of the sale in accordance with the method of accounting regularly employed in the keeping of his books and reporting his income. And where the taxpayer reports his income on the cash basis, the rule for reporting the gain from sales of property, whether personal or real, is in substance the same as that prescribed by the above regulation section 29.44-4, namely, that the cash, plus other property and the evidences of indebtedness of the purchaser, such as notes or mortgages, to the extent of the fair market value thereof, is to be applied against the basis of the property sold, and if in excess of such basis, is taxable to the extent of such excess. For the case of a taxpayer reporting income on the cash basis and wherein the reporting of gain from deferred payment sales was discussed and decided, see *Harold W. Johnston*, 14 T. C. 560. See also *Milton S. Yunker*, 26 T. C. 161; *Estate of Coid Hurlburt*, 25 T. C. 1286; *Curtis R. Andrews*, 23 T. C. 1026; and *Alice G. K. Kleberg*, 43 B. T. A. 277.

The Castner Company, in reporting its 1951 gain from the sale of its machinery and equipment, and intending to take advantage of the provisions of section 44 (b), reported its gain from the said sale on the installment basis. Since the initial payments received during the taxable year, and as defined in section 44 (b), exceeded 30 per cent of the selling price of the property, it is now conceded that the gain from the sale was improperly reported as installment sale income. It is claimed, however, that the sale in question having been a deferred payment sale, the note evidencing the unpaid balance of the purchase

price had no fair market value and the cash received being less than the Castner Company's basis for the property, the rule above outlined applies, and the Castner Company realized no taxable gain in 1951 on the sale of its machinery and equipment.

Aside from the fact that the evidence not only falls far short of any showing that the note had no fair market value when received, and further, is neither persuasive nor convincing that the value of the note was substantially, if any, less than face, the Castner Company was on an accrual basis of accounting, and the rule applicable to the reporting of gain by cash basis taxpayers from deferred payment sales of personal property where the initial payments exceed 30 per cent of the selling price does not apply. The evidence shows that the Castner Company computed and reported its profits for income tax purposes by the use of inventories, and as noted above, it is provided in section 29.41-2 of the regulations, a regulation of long standing, that where inventories are used by a taxpayer in computing its income, no method of accounting other than accrual will properly reflect income. See *Aluminum Castings Co.* v. *Routzahn*, 282 U. S. 92; *Diamond A. Cattle Co.* v. *Commissioner*, 233 F. 2d 739, reversing on another point 21 T. C. 1; *Caldwell* v. *Commissioner*, 202 F. 2d 112; *Herberger* v. *Commissioner*, 195 F. 2d 293; *Commissioner* v. *A & A Tool & Supply Co.*, 182 F. 2d 300; *Charles M. Kilborn*, 29 T. C. 102; and *Stern Brothers & Co.*, 16 T. C. 295. And under an accrual method of accounting, a receivable is accrued when the right to receive it becomes fixed. It is the right to receive and not the actual receipt that determines its inclusion in gross income. *Spring City Foundry Co.* v. *Commissioner*, 292 U. S. 182. It has been held, however, that where the facts are such that the item in question is uncollectible when the obligation therefor accrues, and there is little or no likelihood of collection in the future, a taxpayer on an accrual basis is not required to report such income. *Corn Exchange Bank* v. *United States*, 37 F. 2d 34; *Joy Manufacturing Co.*, 23 T. C. 1082; *O'Sullivan Rubber Co.*, 42 B. T. A. 721; *Marguerite Hyde Suffolk & Berks*, 40 B. T. A. 1121, 1133; *American Fork & Hoe Co.*, 33 B. T. A. 1139; *Atlantic Coast Line Railroad Co.*, 31 B. T. A. 730, 749; and *Oregon Terminals Co.*, 29 B. T. A. 1332. Here, however, not only are there no facts which in any way support such a proposition, but to the contrary, the facts were such as to justify the belief that the payments would be made when they became due. The payments were in fact made on or before their due dates, and at the time of the trial only two payments remained to be paid and there was every prospect that the entire amount would be paid in full in some 3 years before the due date of the final payment. The entire $8,000 represented an accrued receivable from the date of sale on May 7, 1951, and the respondent did not err in taking the full amount into account in his

determination of the deficiency against the Castner Company for that year.

*C. W. Titus, Inc.*, 33 B. T. A. 930, purports to lay down the rule that where in the case of a casual sale of personal property, the initial payments exceed 30 per cent of the selling price, an accrual basis taxpayer, contrary to the pronouncements above, need not in the year of sale accrue the total selling price, but may compute and report its gain thereon for the year of the sale as under the regulations, in this instance section 29.44–4, *supra*, is permitted to be done in the case of a deferred payment sale of real property not on the installment plan, namely, by applying the cash or other property having a fair market value, plus the obligations of the purchaser to pay the balance of the selling price to the amount of their fair market value, against the seller's basis for the property sold, and to report as the gain realized in the year of the sale only the excess thereof, if any, over basis.

Actually there was no mention of any sale of personal property in the allegation of error in the *Titus* case, but, as alleged, the error was that the respondent had erred in computing the amount of the profit for the contract year arising from the sale of oil and gas leases. See the original report in the same case, 32 B. T. A. 1222, 1229. The only apparent reference in the transaction to personal property of any kind was that five wells were then drilling at stated locations on one one-quarter section of the lands covered by the leases sold, and that the conveyances should include the interest of the seller in all equipment on the premises for use in drilling and equipping the five wells. And according to the facts as shown at page 1223 in the original report, this equipment was limited to the casing for the said wells, the fuel for drilling them, and possibly some equipment for supplying the water required for the drilling operation. There is no indication that, for the purposes of the sale, there was any segregation of the said equipment from the leases, or that any part of the sale price was allocated or allocable thereto. In short, there is every indication that the inclusion of the personal property in the conveyances to be made was purely incidental and of no controlling importance in the sale made.

The conclusion that an accrual basis taxpayer may report the gain in the case of a casual sale of personal property like a sale of real property on the deferred payment plan not on the installment basis, appears to have been based on the Bureau of Internal Revenue ruling G. C. M. 1387, VI–1 C. B. 48, and certain cited cases. As to G. C. M. 1387, however, it is to be noted that the taxpayer, in seeking the ruling, stressed the fact that her books of account were kept on the cash basis and that the ruling itself was restricted to taxpayers on the cash

receipts and disbursements basis. Of the 12 cases cited, the facts definitely show that in 8 cases the taxpayer was on the cash receipts and disbursements basis, although it is true that in *Bedell* v. *Commissioner*, 30 F. 2d 622, affirming 9 B. T. A. 270, the Court of Appeals did not rest its decision on the proposition that the taxpayer was or was not on the cash basis, but concluded that the sale was conditional and not a completed transaction in the year of the contract. Furthermore, it appears that the sale there in question was a sale of real estate, which would come under the regulation covering deferred payment sales of real estate, in this instance section 29.44–4 above. Similarly, in 1 of the 4 remaining cases, *Calvin T. Graves*, 17 B. T. A. 1318, wherein the Commissioner had determined the deficiency on the accrual basis, the decision was bottomed on the proposition that there was in the year of the contract "no obligation on the part of the prospective purchaser to make the subsequent payments and there was * * * nothing to accrue." In one of the remaining cases, which involved real estate sales, it was held that the taxpayer had properly reported its income on the installment basis and could not thereafter elect to have the tax for that year computed on another basis. In another case, the Commissioner had determined that the sale was an installment case, and his determination was sustained for failure of proof on the part of the taxpayer. In the remaining case, where the sale had been reported on the installment basis, it was determined that the Commissioner had erroneously concluded that the initial payment was more than 25 per cent of the selling price, which percentage was then the limitation for reporting sales on the installment basis. Thus none of the authorities cited in *Titus* supports its conclusion stated at the beginning of this paragraph.

It further appears, from our search of the decided cases, that the *Titus* case has been cited and relied on only in cases wherein the taxpayer was on the cash basis of accounting, or where the sale was a sale of real estate and thus subject to the regulation covering deferred payment sales of real property not on the installment plan. *Nina J. Ennis*, 17 T. C. 470; *Fidelity Savings & Loan Co.*, 44 B. T. A. 471; *Alice G. K. Kleberg, supra;* and *William A. Hines*, 38 B. T. A. 1061. We are of the view that such limited citing of the said case is in harmony with the law and the regulations and that the discussion therein relating to accrual basis taxpayers does not reflect the law and is not controlling.

The respondent now concedes that he was in error in determining that the petitioner received an informal dividend of $3,427.77 just prior to the liquidation of the Castner Company in October 1952. Accordingly, only one issue remains to be decided, namely, whether the respondent erred in increasing the amount received by petitioner

in liquidation of his Castner Company stock by $4,000, representing the difference between the $3,000 at which petitioner reported the note and $7,000, its unpaid principal amount at the time he received it in liquidation.

It is our opinion that the evidence of record does not convincingly show or establish that the value of the note at the critical date was any less than $7,000, the unpaid principal amount thereof. To support his claim of no value, or at least no value in excess of $3,000, for the note when received by him, the petitioner places his reliance on his own testimony, to the effect that prior to the liquidation of the Castner Company he offered the note for sale or discount to a number of parties, including two banks, and was turned down on each and every occasion. He called only two witnesses to corroborate his testimony. They were representatives of the banks, one in Nashville and one in Clarksville. Neither of the witnesses expressed any view as to the value of the note as of the dates it was offered to them, one of them stating specifically that he did not feel qualified to express an opinion as to the fair market value of the note. The substance of the testimony of each witness was that the offer of the note was refused because it was the policy of the bank not to buy or discount negotiable paper of the character represented by the note, and not because it was or was not worth the principal amount.

It was also the testimony of the petitioner that at or about the same time, he offered the note to Brothers and Burklow at a discount of $1,000, and the offer was refused. Neither Brothers nor Burklow, when testifying and asked about the incident, remembered that any such offer occurred. It was Burklow's recollection, however, that on May 7, 1951, the date of the sale by Castner Company of its machinery and equipment to him and Brothers, petitioner offered to pay him, Burklow, a profit of $1,000 for his interest in the contract.

Generally speaking, it is an accepted fact that the present value of a dollar payable on a date in the future is less than a dollar. Here, however, the holder of the note at the date of liquidation of the Castner Company was not to be limited to the receipt of $7,000, the unpaid principal amount of the note at that time, but, by the terms of the note, was to receive over a period of some 8½ years, unless the entire balance of principal should be sooner paid, quarterly installments of $253.08, except for the final installment which would be at least $177.45, or total payments of $8,529.09, representing a premium of $1,529.09 on the principal amount of $7,000. The evidence shows that at the time of the Castner Company liquidation all the quarterly payments on the note had been made on or prior to the due date; also that such continued to be the case with respect to the payments thereafter falling due; that substantial payments were made in advance, and that as of the date of trial a balance of only $423.06, including both principal and

interest, remained to be paid, and if those payments due on February 10, 1958, and May 10, 1958, should be paid when due, the entire obligation would be satisfied as of the latter date, 3 years in advance of the final due date as shown by the note itself.

Based on the facts as they were at the time of the liquidation of Castner Company, when petitioner received the note in such liquidation, and as corroborated by the payments thereafter made until the date of the trial herein, the record will not justify or support a conclusion that the respondent was in error in determining that the fair market value of the note at the time received by petitioner was not less than $7,000, the unpaid principal amount thereof.

In view of the respondent's concession of error with respect to his determination that the petitioner had received an informal dividend from the Castner Company in 1951, a recomputation of the deficiency in the case of George L. Castner and Lucile C. Castner will be necessary.

*Decision will be entered for the respondent in Docket No. 55774.*