JAMES HERVEY JOHNSON, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 15102–80.     Filed April 8, 1982.

---

*Sebastian D'Amico*, for the petitioner.
*Kevin M. Bagley*, for the respondent.

OPINION

RAUM, *Judge*: The Commissioner determined a deficiency of $52,008.13 in petitioner's income tax for the taxable year ended December 31, 1974. The principal issue is whether a $102,000 cash distribution received by petitioner, as part of an exchange of stock for stock plus cash in a recapitalization of the Missouri Pacific Railroad Co. is taxable to him as a dividend, pursuant to sections 368(a)(1)(E) and 356(a)(1) and (2), I.R.C. 1954, or whether such cash may, in the circumstances of this case, be lumped together with other cash received by him as proceeds of a sale of a portion of his new stock, thus permitting the aggregate sum of cash to be taxed as capital gain to the extent of the excess over basis of the shares thus sold. The case was submitted on the basis of a stipulation of facts.

At the time the petition was filed, petitioner was a resident of San Diego, Calif. His 1974 income tax return was filed with the Internal Revenue Service Center in Fresno, Calif.

During the years 1968 and 1969, petitioner purchased 120 shares of class B stock of the Missouri Pacific Railroad Co. (MoPac), at a cost of $165,100. Just prior to this time, in December of 1967, a class B stockholder of MoPac filed suit against MoPac and several other defendants, alleging violations of the class B stockholders' dividend rights and setting forth other possible causes of action. In September of 1968, it was ordered that the lawsuit be maintained as a class action on behalf of all class B stockholders.

As a consequence of settlement of that litigation, MoPac was recapitalized. Petitioner, as a class B stockholder, received in 1974 from MoPac, in exchange for each share of his class B stock, $850 cash and 16 shares of new common stock. At the same time, he sold (at $100 a share) 1,376 of his 1,920 new common shares to the Mississippi River Corp. (MRC), which

was the majority stockholder of the former class A shares. Although petitioner apparently treated the recapitalization as a nontaxable reorganization in respect of the stock for stock exchange, his characterization of the $850 per share ($102,000 total) cash distribution from MoPac was substantially different. Petitioner aggregated this MoPac cash with the $137,600 which he received from MRC upon the sale of the 1,376 shares of his new common to MRC, and he sought to have all of this cash taxed as capital gain to the extent that it exceeded his basis in the 1,376 shares sold. The Commissioner, on the other hand, determined that the $102,000 cash distribution by MoPac was taxable as a dividend (ordinary income), and that the sale of the 1,376 shares of new common to MRC for $137,600 was a separate transaction taxable in the same manner as the sale of any capital asset. We hold that the Commissioner was correct.

A proper analysis of the problem requires some understanding of the complex events leading up to the foregoing recapitalization of MoPac. The following brief summary of those events is intended to serve as a background for considering the matter before us.

Reorganization proceedings involving the Missouri Pacific Railroad Co. began in 1933. After much litigation, a reorganization finally took effect in 1956, from which two classes of stock emerged: class A, issued to the former preferred stockholders, and class B, issued to the former common stockholders. Each share of both classes had one vote, but class A stockholders were entitled to a noncumulative dividend, not to exceed $5 per share annually, and a preferred distribution of $100 per share in the event of liquidation. Class B stock was entitled, in the discretion of the board of directors, to receive dividends without limitation after the $5 dividend was paid with respect to the class A stock, and, upon liquidation, the entire equity in excess of the class A preference. Since the number of class A shares amounted to about 98 percent of the total number of both classes outstanding, the class A stockholders had the power to elect MoPac's board of directors and exercise voting control in other respects.

After ensuing litigation which finally reached the Supreme Court, it was determined that in matters involving mergers, consolidations, or a corporate restructuring affecting the

rights of either class, the assent of a majority of each class was required. *Levin v. Mississippi River Fuel Corp.*, 386 U.S. 162 (1967). In effect, this gave the class B stockholders a veto over any proposed reorganization. The class B stockholders in fact prevented a merger which was strongly desired by the class A stockholders and exacerbated the friction between the classes. In this connection, a prime source of conflict between the two classes was the refusal of the board of directors to declare any class B dividends in excess of $5 per share each year, notwithstanding the apparent availability of ample funds for substantial additional dividends. Thus, the true equity owners of MoPac's stock were denied access to its earnings by a class of stock that had a severely restricted equity interest in the corporation. In short, there was "a basic conflict between the two classes, with the equity ownership principally in the B stock, but with effective operating control in the A stock." *Levin v. Mississippi River Corp.*, 59 F.R.D. 353, 358 (S.D. N.Y. 1973), affd. sub nom. *Wesson v. Mississippi River Corp.*, 486 F.2d 1398 (2d Cir. 1973), cert. denied 414 U.S. 1112 (1973).

The situation was further complicated by the composition of each of the two classes of shareholders. Alleghany Corp. (Alleghany) was the owner of about half of MoPac's outstanding common stock prior to the 1956 reorganization, and, during the years thereafter of present concern to us, was the owner of about 53 percent, or 21,243 shares, of the total outstanding 39,731 shares of MoPac's class B stock. It was thus pitted against MRC, which began acquiring class A stock in 1959, and which, by 1963, became the owner of 58 percent of class A stock. By 1973, MRC owned about 63 percent of a total of 1,864,052 outstanding shares of class A stock.

As a consequence of the dissatisfaction of the class B stockholders with the treatment received at the hands of the MRC-controlled board of directors of MoPac, litigation was instituted against MRC, MoPac, and others in the U.S. District Court for the Southern District of New York. The suit was commenced in December 1967 by an individual minority class B stockholder named Betty Levin. Thereafter, Alleghany and another minority class B stockholder intervened as parties plaintiff, and, as already noted, the District Court ordered in 1968 that the suit be maintained as a class action on behalf of all class B stockholders. The principal antagonists were then

Alleghany, MRC, and of course MoPac, which was controlled by MRC.

Although three causes of action were alleged by the plaintiffs, the thrust of the complaints of all three plaintiffs was that MRC had misused its voting power to have the MoPac board of directors restrict dividends on the class B stock. The relief sought in this respect demanded the declaration of additional dividends for prior years and increased dividends in the future.[1] After extensive pretrial procedures, a settlement agreement dated December 18, 1972, was executed by Alleghany, MoPac, and MRC. The settlement was thereafter approved by the District Court on March 19, 1973. *Levin v. Mississippi River Corp., supra.* Also, an order of the Interstate Commerce Commission authorizing the recapitalization of MoPac pursuant to the settlement agreement was subsequently sustained in a suit brought by three disappointed stockholders of MoPac to set aside that order. *Gabriel v. United States*, 416 F. Supp. 810 (D. N.J. 1976).

The settlement called not only for cash payments by MoPac to the class B stockholders, but also for the recapitalization of MoPac in such manner as to eliminate the basis for controversy between the class A and class B stockholders. Thus, it undertook collaterally to resolve the conflict between Alleghany and MRC, through MRC's purchase of Alleghany's interest in the corporation, while at the same time according MRC a voting and equity interest in the recapitalized MoPac commensurate with MRC's investment in the enterprise. For present purposes, it is sufficient to summarize in simplified form the technique by which the foregoing was to be achieved:

(a) Each share of class A stock would be exchanged for 1 share of new $5 cumulative voting preferred stock, convertible into 1 share of new common after 1 year following ICC approval of the recapitalization, and redeemable at MoPac's option after December 31, 1975, for $100 per share. Each share

---

[1]The other two causes of action were based primarily, if not exclusively, upon the allegations that dividends to the class B stockholders were improperly limited. The first such additional cause of action charged a conspiracy by MRC and MoPac's board of directors to "freeze out" the class B stockholders. The second such additional cause of action alleged that the acts and conduct underlying the first were in violation of sec. 10(b) of the Securities Exchange Act of 1934, and rule 10b–5 promulgated thereunder, as well as the defendant's common law duty owed to the class B stockholders.

of class B stock would be surrendered for 16 shares of new common plus $850 cash.

(b) Upon approval of the plan by specified percentages of both class A and class B stockholders, as well as by the ICC, MRC would be required to make a cash tender offer to all class B stockholders for at least 400,000 shares of the new common at $100 per share. Alleghany alone would be required to tender its new common shares (339,888) to MRC; it would be entirely optional with each of the minority class B stockholders whether to tender any or all of the new common allocable to such stockholder. If more than 400,000 shares were tendered, MRC could purchase the tendered shares on a pro rata basis. In substance, MRC was required to pay $40 million in exchange for 400,000 shares of new common which, when added to its 1,158,395 shares of new voting convertible preferred stock, would preserve its approximately 63-percent voting control. Alleghany, upon receipt of a very substantial cash consideration, would at the same time be eliminated as a potentially divisive irritant.

Among other things, MoPac and MRC agreed to pay the plaintiffs' counsel fees and expenses allowed by the District Court. Such fees and expenses were thereafter allowed by the District Court in respect of the services of two law firms in the amounts of $850,000 and $1,750,000 (plus disbursements of $22,422.06). *Levin v. Mississippi River Corp.*, 377 F. Supp. 926 (S.D. N.Y. 1974).

The settlement was in fact carried out in accordance with its terms. MoPac was recapitalized, and on or about January 23, 1974, petitioner received 1,920 shares of new common and $102,000 in cash in exchange for cancellation of his class B stock. At the time of the cash distribution of $850 per share, MoPac had sufficient earnings and profits to cover the distribution. The record does not show how many shares of new common were tendered by petitioner to MRC, but it is stipulated that he "thereafter sold 1,376 shares of new common" to MRC for $100 each. On his 1974 return, petitioner undertook to combine MoPac's cash distribution with the cash received from MRC for his 1,376 shares of new common to arrive at a long-term capital gain as follows:

| | |
|---|---:|
| Cash (120 × $850) ................... | $102,000 |
| Stock sale proceeds ................... | 137,600 |
| Cost basis ............................... | [2](118,893) |
| Capital gain ............................. | 120,707 |

In his notice of deficiency, the Commissioner treated the exchange of stock for stock as nontaxable, but determined that petitioner realized and recognized $102,000 in ordinary income upon MoPac's distribution of $850 for each of his 120 shares of class B stock.[3] The Commissioner at the same time recomputed the capital gain upon sale of the 1,376 shares of new common to MRC. As just indicated in note 3 *supra*, petitioner does not challenge the latter recomputation if the Commissioner is sustained in his determination in respect of the $102,000 distribution.

We consider preliminarily whether there was a tax-free reorganization under section 368(a)(1)(E), then, whether petitioner is correct in his position that the MoPac cash distribution and the MRC purchase of new common were interdependent parts of a single capital transaction, and, finally, whether the $102,000 cash distribution was "boot" taxable as ordinary income.

1. *Section 368(a)(1)(E).*—We need not dwell at length on the question whether the elimination of the class A and class B stock of MoPac and the issuance of new preferred and new common stock by the same corporation constituted "a recapi-

---

[2]The record does not show how petitioner arrived at this $118,893 figure. The cost basis of his original class B stock was $165,100, which (assuming that the entire $102,000 cash distribution was either a dividend or capital gain) then became the basis for the 1,920 shares of new common that replaced the class B stock. Sec. 358(a)(1). Accordingly, the portion of that basis allocable to the 1,376 shares of new common sold by petitioner to MRC would appear to be—

$$\frac{1,376}{1,920} \times \$165,100 \text{ or } \$118,321.65$$

[3]The notice of deficiency was based on petitioner's original return (as adjusted by the Service Center for certain mathematical errors), notwithstanding that petitioner had filed an amended return in which he showed a confusing computation resulting in a capital gain of $88,939 in respect of the cash received from MoPac and the proceeds of sale of the 1,376 shares of new common. However, neither in his pleadings nor on brief does petitioner undertake to support or rely upon the computation in his amended return, but contests merely the Commissioner's determination that the $102,000 cash distribution represents ordinary income. The parties have stipulated that "if the court sustains the respondent's position, the deficiency determined by the notice of deficiency is correct in all respects."

talization" within section 368(a)(1)(E), and therefore a "reorganization" under section 368(a)(1), resulting in nonrecognition of gain or loss on the exchange of stock for stock. Indeed, petitioner has not questioned the applicability of section 368(a)(1)(E), and, in apparent reliance thereon, he in fact did not report any gain or loss in respect of that portion of his new common stock (544 shares) which he did not sell to MRC.

The Supreme Court has said that the statutory term "recapitalization" refers to a "reshuffling of a capital structure, within the framework of an existing corporation." *Helvering v. Southwest Consolidated Corp.*, 315 U.S. 194, 202 (1942), rehearing denied 315 U.S. 829 (1942), rehearing denied 316 U.S. 710 (1942). Such a "reshuffling" is precisely what occurred here, where there was a recasting of the capital structure of the same corporation coupled with the required buy-out of the dominant dissident interest (Alleghany) in the enterprise. Cf. *Hickok v. Commissioner*, 32 T.C. 80, 91 (1959).

Moreover, we note that the documents in evidence, including the settlement agreement, the trial court's opinion approving the settlement agreement, and the proposal to MoPac's shareholders, all refer to the transaction under the heading "Plan of Recapitalization." Of course, we are not bound by the label used or the form in which the transaction is cast (cf. *Gregory v. Helvering*, 293 U.S. 465, 469 (1935)), but here the substance comports with the label and the form. We are fully satisfied that there was a "recapitalization" in this case. The restructuring of MoPac was plainly a "recapitalization" within section 368(a)(1)(E), and was therefore a "reorganization" within the meaning of section 368(a)(1), which brings into play the nonrecognition provisions of sections 354 and 356. The District Court explicitly recognized that result in approving the settlement when it indicated that the portion of the transaction involving the exchange of stock for stock was tax free. *Levin v. Mississippi River Corp., supra*, 59 F.R.D. at 372. It is not necessary to belabor the issue further.

2. *The step-transaction issue.*—Petitioner's position in substance is that the exchange of stock for stock, the distribution by MoPac of $850 cash in respect of each share of the old class B stock, and the sale of part of his new common to MRC must be blended together and treated as a single capital transaction. He thus combines the $102,000 distribution by MoPac with the

wholly separate $137,600 proceeds from the sale of 1,376 shares of new common *to MRC*, subtracts the basis allocable to the 1,376 shares, and treats the resulting difference as long-term capital gain. Stated somewhat differently, his position is that, because the MoPac recapitalization and the MRC tender offer were interdependent parts of the settlement agreement, we should view the entire transaction as a sale of petitioner's stock. In essence, petitioner asks us to apply the "step-transaction" doctrine. We decline, for the doctrine is inapposite here.

Petitioner had no obligation whatever to tender his stock to MRC. Cf. *International Telephone & Telegraph Corp. v. Commissioner*, 77 T.C. 60, 76 (1981). Although the recapitalization and subsequent sale of *Alleghany's* stock to MRC may have been "steps so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series" (*American Bantam Car Co. v. Commissioner*, 11 T.C. 397, 405 (1948), affd. 177 F.2d 513 (3d Cir. 1949), cert. denied 339 U.S. 920 (1950)), the same cannot be said of petitioner's sale. The settlement agreement unshackled MoPac's management by eliminating the bifurcated shareholder control which had curbed needed corporate flexibility. This result was completely accomplished by MRC's purchase of Alleghany's new shares (the only shares required to be tendered), since MRC thus acquired the requisite majority control of the voting stock in all respects. MRC's purchase of other MoPac shares was merely incidental to the Alleghany transaction, for the basic objective of the settlement agreement in respect of the sale of new common to MRC would have been accomplished even if petitioner had retained all of his new stock.

In addition to the foregoing, it must be remembered that the $102,000 came not from MRC but from MoPac. We are not faced with a situation where, contemporaneously with the distribution, the taxpayer sold (*Zenz v. Quinlivan*, 213 F.2d 914, 917 (6th Cir. 1954)) or exchanged (*McDonald v. Commissioner*, 52 T.C. 82, 87 (1969)) all of his remaining interest in the distributing corporation. In those cases, the steps were "telescoped" because it was apparent that the distribution was simply one part of a process of divorcing the shareholder from the distributing corporation. Petitioner, however, remained a stockholder of MoPac after his voluntary sale of shares to

MRC. We fail to see any basis for classifying the $102,000 cash distribution by MoPac as part of the proceeds from the sale of petitioner's stock to MRC.[4] We therefore reject petitioner's characterization of the distribution, and proceed to consider whether the $102,000 distribution by MoPac must be treated as a dividend taxable as ordinary income.

3. *Taxability of the $102,000 cash distribution as a dividend.*—One of the principal consequences of the classification of the restructuring of MoPac as a "reorganization" is that, pursuant to section 354(a)(1), no gain or loss is to be recognized where stock of a party to the reorganization (MoPac) is exchanged pursuant to the plan of reorganization "solely" for stock in such corporation. And section 356(a)(1) provides, in effect, that where section 354 would otherwise be applicable, but for the fact that "other property or money" is received in addition, "then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property." The term "other property or money" is sometimes referred to as "boot," and in this case, the $102,000 is plainly boot. The "gain" on the exchange must be recognized but in an amount "not in excess" of the boot, namely, not in excess of $102,000. We must therefore determine the amount of gain realized by petitioner on the exchange.

The exchange consisted of the surrender of petitioner's old class B stock, having a basis of $165,100, for 1,920 shares of new common and the $102,000 cash. To compute the gain we must first find a value for the 1,920 shares of new common. In arm's-length bargaining by the parties to the settlement agreement, the new common was treated as having a value of $100 a share. Petitioner, who bears the burden of proof (*George L. Castner Co. v. Commissioner*, 30 T.C. 1061 (1958)), has offered no evidence to show any other value, and we

---

[4]In emphasizing that the step-transaction principle does not apply in respect of petitioner's sale of part of his new common to MRC because it was an entirely voluntary act on his part, we do not mean to suggest that the cash received by Alleghany from MoPac must be combined with the cash it received from MRC and treated as the proceeds of the required sale of its new common to MRC. Whether such result would necessarily follow even though the step-transaction principle would otherwise be applicable to Alleghany is a matter that we need not pass upon here. It is sufficient in this case to hold merely that the *voluntary* disposition by petitioner of part of his new common to MRC was a wholly separate and separable transaction.

accordingly find that the 1,920 shares of new common had a fair market value of $192,000 at the time of the exchange. The gain realized by petitioner on the surrender of his former class B stock for the new common plus cash was therefore $192,000 plus $102,000 minus his basis of $165,100. Simple arithmetic shows that such gain was $128,900, an amount in excess of the $102,000 cash. This latter amount must therefore be recognized in accordance with section 356(a)(1). However, the further question remains as to the proper classification of such gain. Is it to be treated as capital gain or as a dividend which is taxable as ordinary income? The applicable test is set forth in section 356(a)(2).[5]

Section 356(a)(2) provides that if the exchange is one within the provisions of section 356(a)(1), "but has the effect of the distribution of a dividend," then the recognized gain to the extent of the recipient's ratable share of the corporation's undistributed earnings and profits "shall be treated as a dividend." And in the present case, the parties have stipulated that as of the date of distribution, MoPac "had earnings and profits sufficient to cover the cash distribution." Accordingly, treatment of the gain must turn on "the effect of the distribution."

For many years, the view was widely held that section 356(a)(2) required that any recognized gain be taxed as a dividend to the extent of the corporation's earnings and profits, at least where the distributee remained a shareholder after the reorganization. See B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders par. 14.34 at 14–117, 14–118 (4th ed. 1979). This construction of the statute stemmed from the Supreme Court's opinion in *Commissioner v. Estate of Bedford*, 325 U.S. 283, 292 (1945). In subsequent cases, however, the courts have retreated from this so-called automatic dividend rule; instead, the focus has

---

[5]SEC. 356. RECEIPT OF ADDITIONAL CONSIDERATION.

(a) GAIN ON EXCHANGES.—

\* \* \* \* \* \* \*

(2) TREATMENT AS DIVIDEND.—If an exchange is described in paragraph (1) but has the effect of the distribution of a dividend, then there shall be treated as a dividend to each distributee such an amount of the gain recognized under paragraph (1) as is not in excess of his ratable share of the undistributed earnings and profits of the corporation accumulated after February 28, 1913. The remainder, if any, of the gain recognized under paragraph (1) shall be treated as gain from the exchange of property.

shifted to the nature of the distribution (*Bateman v. Commissioner*, 40 T.C. 408, 419 (1963)) and the effect of the reorganization on the distributee's interest in the corporation. *Shimberg v. United States*, 577 F.2d 283, 286–290 (5th Cir. 1978), cert. denied 439 U.S. 1115 (1979); *Wright v. United States*, 482 F.2d 600, 604 (8th Cir. 1973); *Hawkinson v. Commissioner*, 235 F.2d 747, 751 (2d Cir. 1956). The Internal Revenue Service has likewise adopted the latter approach, stating that "it is appropriate to look to principles developed under section 302 for determining dividend equivalency." Rev. Rul. 75–83, 1975–1 C.B. 112, 113.

We think there can be little doubt, under any of the above approaches, that the cash distribution to petitioner had the effect of a dividend. The recapitalization of MoPac actually increased petitioner's absolute voting interest, because the 16 to 1 conversion rate for class B shares exceeded the 1 to 1 rate for class A shares.[6] It is true that petitioner's class voting rights were lost due to the alteration of MoPac's capital structure,[7] but this loss was common to all shareholders and thus cannot explain the distribution of cash to the class B shareholders only. Moreover, the very fact that the $850 per share distribution was made pro rata to the class B shareholders, while no distribution was made to the class A shareholders, seems to us strong support for the conclusion that the sole purpose of the distribution was to compensate the class B shareholders for prior dividends unfairly withheld. It is plain to us on this record that the plaintiff's dominant cause of action[8] in the shareholder litigation called for the payment of additional dividends on the ground that prior dividends on the class B shares had been unfairly limited to $5 per share, which was the maximum permissible dividend for the class A shares, despite substantial differences in the equity value of the two

---

[6]This result is unaffected by petitioner's sale of shares to MRC, for as we stated above, there is no basis for "telescoping" the mandatory recapitalization and voluntary sale into a single transaction.

[7]Neither the new preferred nor the new common shareholders were entitled to a class vote, except in the event of arrearages in the preferred stock dividends, in which case those shareholders could elect two directors.

[8]See *Levin v. Mississippi River Corp.*, 377 F. Supp. 926, 929 (S.D. N.Y. 1974) ("The principal thrust of the plaintiffs' claims was directed toward MoPac's restricted dividend policy and the relief sought included the declaration of additional dividends in prior years").

classes. To be sure, there were two other causes of action, but each of them was based primarily, if not exclusively, on the same charge that dividends in prior years had been improperly withheld. See note 1 *supra*, p. 569. In our judgment, the primary reason, and perhaps the sole reason, for the cash distribution of $850 per share was to compensate the class B shareholders for dividends missed. Accordingly, we hold that the cash distribution had "the effect of the distribution of a dividend" within the meaning of section 356(a)(2). Petitioner must therefore include in his gross income a dividend of $102,000 for the year ended December 31, 1974.

*Decision will be entered under Rule 155.*