Carey Advertising, Inc. v. Commissioner. James W. Carey and Mary L. Carey v. Commissioner.
Carey Advertising, Inc. v. Commissioner
Docket Nos. 2320-69 and 2321-69.
United States Tax Court
T.C. Memo 1972-124; 1972 Tax Ct. Memo LEXIS 133; 31 T.C.M. (CCH) 497; T.C.M. (RIA) 72124; June 1, 1972, Filed. Tried in Buffalo, New York. *133 Petitioner purchased an advertising business from Mrs. Ward. Under petitioner's purchase contract with Mrs. Ward he obtained certain assets, works in progress, and the goodwill of the business in addition to the noncompetition covenant of Mrs. Ward for a 498 percentage of the gross billings from existing accounts earned over a period of years. The contract did not allocate any portion of the purchase price to the noncompetition covenant, and Mrs. Ward did not agree separately to any such allocation. Mrs. Ward did not have any expertise in the business, which had been run by her deceased husband; and she did not intend to enter the advertising business. Held: Petitioner cannot deduct under section 167 any part of the amounts paid under the purchase agreement as having been paid for Mrs. Ward's noncompetition covenant. Edward W. King, for the petitioners. John D. Steele, Jr., for the respondent. IRWIN
Memorandum Findings of Fact and Opinion IRWIN, Judge: Respondent determined deficiencies of $692.34 and $650.84 in the income taxes of Carey Advertising, Inc., for the fiscal years ending March 31, 1965, and March 31, 1966, respectively, and deficiencies of $1,099.09 and $969.58 in the income taxes of James W. and Mary L. Carey for the calendar years 1963 and 1964, respectively. After concessions regarding other issues one issue remains: whether two-thirds of the amounts paid by Carey Advertising, Inc., to Margaret McPherson Ward under an agreement entered into February 27, 1961, represented compensation for the covernants of both Mrs. Ward and Taylor M. Ward, Inc., not to compete. The statutory notice also reduced the corporation's charitable deduction to reflect the increase in taxable income due to respondent's treatment of the covenant not to compete. Findings of Fact Some of the facts have been stipulated. The stipulation and the exhibits attached thereto are incorporated herein by this reference. Petitioners are James *135 W. Carey and Mary L. Carey and Carey Advertising, Inc. James W. and Mary L. Carey are husband and wife who resided, as of the date they filed the petition herein, in Ithaca, N. Y. Their joint Federal income tax returns for the taxable years 1963 and 1964 were prepared and filed on the cash receipts and disbursements method of accounting with the district director of internal revenue, Buffalo, N. Y. Mary L. Carey has been included as a petitioner only by reason of her having filed joint returns with her husband for the taxable years 1963 and 1964. Unless otherwise noted, all further references to "petitioner" will refer to James W. Carey. Carey Advertising, Inc., is a New York corporation with its principal place of business during the taxable years here involved and on the date the petitioner herein was filed in Ithaca, N. Y. Carey Advertising, Inc., was organized on March 1, 1961, by petitioner for the purpose of carrying on the advertising business purchased by petitioner, as its agent, from Taylor M. Ward, Inc., on February 27, 1961. For the fiscal years ended March 31, 1963, and March 31, 1964, it filed its returns as a small business corporation, and for the years ending *136 March 31, 1965, and March 31, 1966, it filed regular corporate returns. Taylor M. Ward ran the Taylor M. Ward, Inc., advertising business in Ithaca, N. Y. until his death, by suicide, on August 1, 1960. The fifth paragraph of the will of Taylor M. Ward bequeathed his interest in said advertising agency to his widow, Margaret McPherson Ward, and contained his recommendation that said business be liquidated within 60 days after his death. Donald McPherson, the first husband of Margaret McPherson Ward, died June 14, 1950, at the age of 43 years, having been ill for some two years prior thereto, with a congenital kidney disease. At the time of his death, the McPhersons had three children, all boys, ages of 21 months, 8 years and 11 years. Margaret McPherson Ward had conducted the McPerson construction business under her husband's guidance for some two years prior to his death, and she continued the conduct of said business thereafter and to the date of trial. Following the death of her first husband Mrs. Ward devoted as many as 55 hours per week to the McPherson construction business, and at the time of the death of Mr. Ward she devoted about 40 hours per week to it. Shortly after *137 Taylor M. Ward's death, Mrs. Ward contacted a Robert W. Flannery and attempted to negotiate the sale of Taylor M. Ward, Inc., to him. Thereafter, the sale of Taylor M. Ward, Inc., to Mr. Flannery fell through and Mrs. Ward hired 499 petitioner, a former employee, to manage Taylor M. Ward, Inc., with the promise of giving him an employment contract with an option to purchase the advertising agency. The negotiations between James Carey and Margaret McPherson Ward from late August 1960 to early February 1961 concerned the promised employment contract and, more particularly, the terms of the option to purchase the advertising business. The starting point for the negotiations between petitioner and Mrs. Ward was an earlier proposed sales agreement between Mrs. Ward and Flannery. This proposed agreement did not contain any covenant of Mrs. Ward not to compete with the purchaser of the advertising business. During the period of negotiation between Mrs. Ward and petitioner, several other memoranda were exchanged by and between the parties and their respective attorneys, Mr. Enos Pyle and Mr. Edward W. King. These documents were mainly concerned with arriving at a formula for the sales *138 price and with designating the assets of the business to be sold. Although some documents contained a provision to the effect that Mrs. Ward would devote her best efforts to the success of the advertising business of petitioner, there was no specific mention of a covenant not to compete after sale of the business in any of them. Although the negotiations between the the parties centered on other matters, petitioner's counsel, King, was aware of the tax advantages of providing that part of the payments for purchase of the business constitute compensation for a covenant not to compete. Nevertheless, there were no serious negotiations between the parties concerning covenants not to compete. On February 27, 1961, a meeting was held by the parties and their attorneys to conclude the negotiations. An instrument was signed by both parties evidencing part of their agreement. Under the agreement petitioner acquired the contracts with clients and publishers and certain assets of Taylor M. Ward, Inc., and the noncompetition covenants of the corporation and its principal shareholder, Mrs. Ward - applicable for 15 years - in exchange for the purchase price. The purchase price was a percentage *139 of the gross billings from certain accounts which were then with the firm payable for 15 years, or so long as the accounts remained with the firm if this was shorter. The written agreement was entirely silent concerning an allocation of any part of the purchase price for the noncompetition covenants. Although petitioner could have acquired the right to use the Taylor M. Ward name without additional cost under the agreement, he chose not to acquire it because he felt that the name had become discredited by some actions that Flannery had taken while dealing with Mrs. Ward. The agreement also did not cover any office equipment which was sold separately. Mrs. Ward's attorney, Pyle (who was also her husband at the time of trial), did not regard the noncompetition covenants as significant and advised his client to sign the instrument containing them on the ground that she did not intend to enter the advertising business in any event. Although she was a capable business woman, Mrs. Ward had in fact little knowledge of the advertising business and intended to continue devoting her full energies to the construction business. Mrs. Ward had never taken an active role in her late husband's *140 business although she did know some of the clients socially and entertained them occasionally. On March 27, 1961, King wrote to Pyle requesting that Pyle prepare a bill of sale and a covenant not to compete signed by Mrs. Ward and that he bring these documents to the final closing on March 31, 1961. Although this meeting was held, the bill of sale and covenant were not delivered to petitioner. On August 29, 1961, Taylor M. Ward, Inc., was dissolved formally. During the fiscal years ending March 31, 1963, through March 31, 1966, Carey Advertising, Inc., paid, pursuant to said agreement, the following amounts to Margaret Pyle: 3-31-63
$4,078.73
3-31-64
4,218.41
3-31-65
4,968.99
3-31-66
4,671.08
On the corporate tax returns for the fiscal years ending March 31, 1963, through March 31, 1966, Carey Advertising, Inc., claimed that two-thirds of the amount paid to Mrs. Pyle represented payment for the covenants not to compete and as such were an amortizable expense. The following deductions were taken: 500 Fiscal Year
Return
Deduction
3-31-63
1120-S
$ 2,719.15
3-31-64
1120-S
2,812.27
3-31-65
1120
3,312.66
3-31-66
1120
3,114.05
*141 Opinion Petitioner purchased an advertising business from Mrs. Ward for a percentage of the gross billings of the accounts then with the firm payable for 15 years. The sales agreement between petitioner and Mrs. Ward contained a covenant by Mrs. Ward and her corporation not to compete with petitioner for 15 years but was silent about allocating any part of the purchase price to the covenant. Petitioner's corporation treated two-thirds of payments made under the agreement as compensation for the noncompetition covenant which would be amortizable under section 167(a). [1] Respondent disallowed the deductions, and we agree with his determination. This case is unlike most cases cited by the parties in that the written agreement between the buyer and seller of the business does not deal with allocating part of the purchase price to the noncompetition covenant. See (C.A. 3, 1967); (C.A. 2, 1959); (C.A. 10, 1954). Additionally, it appears *142 from the record that the written instrument was not intended to represent the complete agreement of the parties; therefore, petitioner is not precluded, as respondent contends from these cases, from introducing evidence of a separate agreement covering allocation of part of the purchase price to the noncompetition covenants. The problem in this case is that we do not believe that the parties to the sale ever reached an agreement concerning an allocation of part of the purchase price to the covenant. Petitioner's attorney, King, who also represented petitioner in negotiating for the business, testified that prior to the February 27, 1961, contract of sale he discussed the allocation problem with Mrs. Ward's attorney and that they reached an agreement to allocate the price one-third to goodwill and two-thirds to the covenant. This allocation was to be stated either in the bill of sale or in a separate instrument to be delivered at the closing. Mrs. Ward's attorney, Pyle, had no recollection on the stand of discussing the allocation with King and denied that there was a one-third-two-thirds allocation agreement. Both witnesses were perfectly candid and credible despite having to remember *143 events which were a decade old. We do not doubt that the noncompetition covenant was considered important by petitioner and that his attorney discussed the allocation problem with Mrs. Ward's attorney; however, the documentary evidence in the record and the portion of the testimony of the witnesses which is not contradictory indicate that the noncompetition covenants were far from the center of the negotiations between the parties. After the major problems in the negotiations had been settled, King wrote to Pyle requesting that the latter attorney prepare a bill of sale and a noncompetition covenant to be delivered to petitioner at the final closing which was to occur on March 31, 1961. Petitioner claims that these documents would have contained an allocation of the purchase price between goodwill and the covenant. Importantly, the bill of sale was never delivered to petitioner, and to this Court's knowledge an instrument containing the covenant was never prepared. These facts indicate that regardless of any discussion about the covenant between the attorneys Mrs. Ward never agreed to any allocation of the purchase price between goodwill and the covenant. The facts of the present *144 case are most like those of (C.A. 9, 1962). In Annabelle, Altshuler and Sommers were equal shareholders of petitioner which manufactured a marshmallow, nut and chocolate confection called "Rocky Road." The recipe for manufacturing the candy and the name "Rocky Road" were not subject to protection from competitors by patent, trademark, or trade name; however, petitioner employed a secret process for making the candy that was known to both shareholders. After disagreements arose between Altshuler and Sommers, petitioner agreed to purchase Sommers' stock. Petitioner treated part of the payments to Sommers as compensation for his covenant not to compete and took amortization deductions for that part. The Ninth Circuit 501 noted the following in reviewing the sales agreement and the intent of the parties: In the purchase agreement involved in the case before us, there is no allocation of consideration to the covenant not to compete. While this is pretty good evidence that no such allocation was intended it is not conclusive on the parties as would be the case if there had been an express affirmance or disavowal in the agreement. *145 But the petitioner, which was asking for a redetermination of a tax deficiency, had the burden of proving that, notwithstanding the lack of any recital to that effect in the agreement, the parties intended to allocate consideration to the covenant. The Tax Court held that petitioner failed to sustain that burden of proof. It is true, as the Tax Court found, that the covenant not to compete played a very real part in the negotiation of a final contract between the parties, and was a valuable benefit to the petitioner. But if the parties did not intend that a part of the purchase price be allocated to this important and valuable covenant, that intention must be respected. * * * Before the agreement was executed Sam Altshuler was advised by petitioner's bookkeeper that an allocation should be made in the agreement or it would not be recognized for tax purposes, yet no allocation was therein made. After execution of the agreement petitioner made a unilateral allocation to its advantage and to the disadvantage of Sommers, without the latter's knowledge or consent. These circumstances warrant the inference that Altshuler purposely refrained from bringing up during the negotiations this *146 matter concerning which he was fully informed because he was afraid Sommers would not agree. The inference to be drawn from the facts in this case is that Pyle failed to deliver the covenant requested by King because he knew that Mrs. Ward would not agree to treat two-thirds of the sale proceeds as compensation for the covenant not to compete which would be taxed to her as ordinary income and because he was hoping to let the problem of the covenant ride. Significantly, petitioner introduced no evidence indicating that he ever attempted to secure a copy of a written covenant not to compete from Mrs. Ward from the time of the closing, March 31, 1961, until the time respondent began investigating his taxes some years later. In several respects the present case presents less favorable circumstances for sustaining an allocation than existed in Annabelle. In that case the shareholder whose interest was purchased had been active in the management of the business and possessed knowledge of a valuable secret formula. His special knowledge could have made him a dangerous competitor. In this case, Mrs. Ward never took an active role in the advertising business and had no advertising expertise. *147 In addition, she devoted her full time to her construction business. We cannot on the record in this case agree with petitioner's contention that she would have been a formidable competitor. Petitioner urges that even if we cannot find that there was an agreement to allocate part of the sale price to the covenant, we should nevertheless assign a value to the covenant which comports with economic reality. (C.A. 7, 1955). The most persuasive reality in this case is that Mrs. Ward had no special knowledge of the advertising business and no desire to enter it; however, petitioner contends that the possibility that Mrs. Ward would revive the Taylor M. Ward, Inc., agency by hiring an experienced advertising man was a significant threat to his business. We do not think Mrs. Ward posed any real threat to petitioner. Petitioner could have purchased the Taylor M. Ward name from Mrs. Ward at no additional cost but chose not to do so because the name had become discredited during the period when Mrs. Ward was negotiating with Flannery. We do not see how this name could become a successful tool for competition in Mrs. *148 Ward's hands. Although Mrs. Ward was a proven successful businesswoman, she had no special qualities which would have given her an advantage in the advertising field. The last contention of petitioner that we shall consider is that the goodwill of Taylor M. Ward, Inc., was not worth more than $20,000 according to his expert witness and that he will end up paying over $77,000 under the purchase agreement. According to petitioner $57,000 or about three-fourths of the purchase price must be compensation for the covenant not to compete. We believe that any amount that petitioner might pay in excess of the value of the goodwill of the business determined at its sale is merely due to the unanticipated longevity of the acquired accounts. Petitioner's expert witness testified that on the average advertising customers change agencies every four or five years. In 502 entering into an agreement with Mrs. Ward which set the purchase price at a percentage of gross billings attributable to customers of the business existing at the time of sale petitioner was gambling that he would lose the existing customers long before the end of the 1k-year contract. If the existing customers had left *149 within four or five years as expected, petitioner's total payment to Mrs. Ward would have been in the nighborhood of $20,000. Petitioner's deal with Mrs. Ward turned sour when the customers acquired from her turned out to be more loyal to him than he expected. The record in this case provides us with no basis for finding directly that an allocation of the purchase price between goodwill and the covenant was agreed upon, or for inferring that such an allocation must have been intended by the parties, or for finding that the economic realities require such an allocation. Accordingly, Decisions will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended.↩