SHARON K. PACK, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Pack v. Commissioner
Docket Nos. 10941-77, 10942-77, 10943-77, 10944-77, 11081-77, 11191-77.
United States Tax Court
T.C. Memo 1980-65; 1980 Tax Ct. Memo LEXIS 519; 39 T.C.M. (CCH) 1179; T.C.M. (RIA) 80065; March 6, 1980, Filed Patrick J. Regan,Michael C. Doering, for the petitioners. Juandell D. Glass, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined deficiencies and transferee liabilities as follows: Petitioner
Year
Deficiency
Sharon K. Pack
1974
$ 1,236.58
1975
246.00
J. Ernest and Mary
1970
1,585.11
Ann Talley
1973
12,862.07
1974
401,209.72
1975
20,782.11
[2] Sharon K. Pack, Transferee 1974
22,852.97
1975
478,574.00
J. Ernest Talley, Transferee
1974
22,852.97
1975
478,574.00
Robert A. Walton, Transferee
1974
22,852.97
1975
478,574.00
V. B. May, Transferee
1974
22,852.97
1975
478,574.00
*521 Concessions having been made by the parties in Docket No. 10943-77 (J. Ernest and Mary ann Talley), the issues for decision are: 1. The amount of depreciation required to be recaptured by Mr. T's Rental, Inc., upon the sale of its rental assets. 2. The fair market value of a promissory note distributed to the shareholders of Mr. T/'s Rental, Inc., in a section 337[3] liquidation. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. At the time they filed their petitions, Sharon Pack and J. Ernest and Mary ann Talley resided in Wichita, Kansas, Robert A. Walton resided in Memphis, Tennesseee, and V. B. May resided in Holt, Missouri. Mr. T's Rental, Inc. ("Mr. T's") was incorporated in Kansas on June 26, 1962, and its principal place of business was Wichita, Kansas. Mr. T's financial statements and tax returns reflected a June 30 fiscal year. From 1970 to its dissolution in 1975, J. Ernest Talley ("Talley") served as president and Sharon K. Pack ("Pack") served as secretary of Mr. T's. Mr. T's rented televisions and *522 stereo units to the general public. Its clientele generally consisted of transient individuals who were either unable or unwilling to obtain the financing necessary to purchase these items elsewhere. These characteristics of its customers exposed Mr. T's to a relatively high level of missing televisions and stereos. Mr. T's offered rentals on a weekly, renewable basis. The rental agreement required the customer to pay the weekly fee in advance in order to retain possession and use of the equipment. If the customer rented the equipment for 104 consecutive weeks the equipment became the customer's property. Prior to that time the customer possessed no ownership rights in the rental property. Mr. T's also offered its customers the option of a daily rental plan at slightly higher rates. A typical rental of a black and white portable television was approximately $7 per week. The same television, rented on a daily basis, cost $3 for the first day and $1 for each succeeding day. Mr. T's provided complete maintenance of the televisions and stereos during the rental term. If a rental unit was not working and could not be serviced in the renter's home Mr. T's provided a replacement *523 unit until the original unit was repaired. Mr. T's purchased their televisions and stereos new from wholesalers. These units were classified as "inventory" for financial and tax reporting purposes. Mr. T's maintained on hand approximately five to ten percent of the total units being rented at any given moment. These surplus units provided flexibility to meet increased demand and to replace units that required repair. Early in its corporate life, Mr. T's engaged an accounting firm to determine the economic life of an average rental unit. After tracing the histories of a sampling of the rental units, the accounting firm assigned to the units an economic life of approximately sixteen to eighteen months. Mr. T's amortized the cost of the rental equipment over this time. By 1974 Mr. T's had established itself as a very profitable enterprise with rental offices in fourteen major cities predominantly situated in the southern part of the United States. [4]
On March 6, 1974, Mr. T's board of directors adopted *524 a plan of complete liquidation. Two days later Mr. T's entered into a sales agreement with Remco Enterprises, Inc., and its subsidiary Action Industries, Inc. (sometimes hereinafter collectively referred to as "Remco") whereby Mr. T's agreed to transfer its rental business as a going concern to Remco for $40,000 cash and a $2,210,000 note. The closing date of the sale was April 1, 1974. In 1974 the following individuals owned stock in Mr. T's: Name
Shares
J. Ernest Talley
613,000
Sharon K. Pack
6,400
V. B. May
1,000
Robert A. Walton
200
Since its inception in 1969 Remco conducted the same type of business as Mr. T's, i.e., the renting of televisions and stereos. Charles Sims ("Sims"), a former officer and stockholder of Mr. T's, founded Remco and was its president and controlling shareholder. By 1974 Remco operated six stores at various locations. Remco hoped to accelerate its expansion program by acquiring Mr. T's assets and business. Remco, however, intended to change its marketing approach in order to attract a higher-income customer. It hoped that as a result of this change in marketing strategy only 12 to 13 percent of its customers would have *525 characteristics similar to those who previously patronized Mr. T's. It expected to achieve this goal within six months of the acquisition. In 1973, its last full year prior to the acquisition of Mr. T's, Remco reported earnings of $82,094 on revenues of $1,265,589. The sales agreement between Remco and Mr. T's provided for the sale and transfer of the following properties and rights: (a) all of the "inventory" of television sets or other appliances or merchandise held for rental on the closing date, as shown by the books of Mr. T's, and wherever located; (b) all of the furniture, fixtures, equipment (including rolling stock), and leasehold improvements owned by Mr. T's and located on or about or used in connection with the business conducted by the stores and the Wichita, Kansas, home office of Mr. T's; (c) all of the right, title and interest of Mr. T's in and to the leases of the stores (Remco agreed to assume liability on all leases for the stores of Mr. T's); (d) all of the right, title and interest of Mr. T's in and to the rental agreements; and (e) all of its right, title and interest in and to the tradename "Mr. T's", together with the perpetual right to use all trademarks, *526 labels and other advertising media or devices adopted or used by Mr. T's in connection with its business conducted at or through the stores. Mr. T's remained responsible for all the preclosing liabilities and obligations as well as any legal proceedings arising from pre-closing transactions. Mr. T's retained all the cash on hand as of April 1, 1974. [5]
According to the sales agreement, the purchasing corporations paid $50,000 for Mr. T's goodwill. The sales agreement also recited that on or prior to April 1, 1974, the balance of the contract price would be allocated to (1) "inventory" and (2) furniture, fixtures, equipment and leases. For many years Mr. T's and Remco were clients of the same accounting firm. Prior to March 8, 1974, Talley and Sims met in the office of their accountant at least once to discuss the sale of Mr. T's assets. During the course of that conversation *527 the parties briefly discussed the allocation of the contract price to the purchased assets. On March 22, 1974, Sims wrote a letter to the accountant outlining his thoughts as to the proper allocation of the contract price to the acquired assets. In deriving the portion allocable to Mr. T's inventory, Sims began by dividing the inventory into categories, i.e., black and white televisions, stereos with tape players, color television consoles, portable color televisions, and color television combinations. He then estimated the cost of a new unit in each category and discounted this new cost by a certain amount. The discount applied did not take into account the age or condition of the televisions or stereos at the time of their sale to Remco. Rather, the discount reflected Sims' perception of changes in consumer preferences and changes in the various product lines. For example, Sims provided the following explanation of the value he assigned to the stereo equipment acquired from Mr. T's: On stereo equipment, there are two classifications. Stereos without tape players, which we will assign the cost of $100, and stereos with tape players, which we will assign a cost of $115. *528 New cost today on similar equipment can vary tremendously, based on quality. Stereos without tape players of similar quality cost approximately $140 new. Stereos with tape players of same quality would cost approximately $165 new, but there have been some major innovations in stereos recently. One of these innovations has been quadraphonic sound, which may affect the market for stereos that are not equipped for quadraphonic. In addition to this, component stereos have become very popular recently, and also could have an affect on the value of stereo equipment. Sims ended the March 22 letter by stating: If these methods of allocating cost and the logic used appears reasonable to you, then I suggest we use these methods and these figures for assigning the cost of assets in this transaction. I would appreciate any recommendations or thoughts you may have in reference to this matter. The accountant agreed that these allocations were fair. As a precondition to its purchase Remco required that, at a minimum, 6,200 rental agreements be in force as of the closing date. A total of 6,744 units of rental equipment, including both rented and idle units, were actually sold to *529 Remco on April 1, 1974. The following is a breakdown of these units together with their values as assigned by Sims in his March 22 letter: Number
New Cost
Total New
Type of Equipment
of Units
per Sims
Cost
B & W Portables
724
$ 97
$ 70,228
Stereos with Tape
1,090
165
179,850
Stereos without Tape
552
140
77,280
Color Combos
724
550
398,200
Color Consoles
2,370
400
948,000
Color Portables
1,284
220
282,480
TOTAL
6,744
$1,956,038
Values Assigned
Total Assigned
Type of Equipment
per Sims
Value
B & W Portables
$ 80
$ 57,920
Stereos with Tape
115
125,350
Stereos without Tape
100
55,200
Color Combos
480
347,520
Color Consoles
375
888,750
Color Portables
200
256,800
TOTAL
$1,731,540
Addendum No. 2 to the sales agreement, dated April 1, 1974, reflected the allocations proposed by Sims in his March 22 letter. Accordingly, that addendum provided the following allocation: Asset
Amount
Inventory--Remco
n6$1,731,620 Goodwill--Remco
77,656
Office Equipment--Remco
20,000
Office Furniture and Equipment--Action
56,000
Mobile Radios--Remco
126,000
Trucks--Remco
118,224
Trucks
46,980
Leasehold Improvements
70,000
Prepaid Rent
3,500
TOTAL
$2,249,980 [6]a
*530 Neither party ever executed this addendum. However, Mr. T's records reflected the allocations proposed in the addendum. The adjusted basis of the rental units as of April 1, 1974 was $486,602.61. [7] The original cost of this equipment to Mr. t's equaled at least $1,731,620. Mr. t's records which reflected the allocations contained in Addendum No. 2 showed a $1,245,017.39 gain from the sale of the rental equipment. [8] The units sold to Remco were, on an average, at least one year old at the time of sale. The estimated replacement cost of these units was $1,956,038. On its tax return for the fiscal year ending June 30, 1974, Mr. T's reported the $1,245,017.39 *531 gain on the sale of the rental equipment as "section 337" gain on the sale of "inventory" not subject to section 1245 recapture. A notation on that tax return read, "All of the inventory was sold to one corporation in one transaction and has not been replaced." A settlement agreement dated October 31, 1975, and signed by the parties, reduced the contract price by $100,000 to $2,150,000. The settlement agreement provided that the values assigned to goodwill and to trucks were to be reduced by $50,000 each. Pursuant to the March 8 sales agreement, Remco executed a $2,210,000 note to Mr. T's on April 1, 1974. [9] The note provided for 48 equal monthly installments plus interest at 12 percent commencing June 1, 1974. [10] The note further provided for an acceleration clause and a prepayment clause. Mr. T's rights under the note were assignable but only with Remco's consent unless the assignment was to a bank or an insurance company, in which case no consent was required. Remco, however, could not unreasonably withhold its consent to any assignment. *532 To secure payment of the note, the parties simultaneously executed a security agreement. The security agreement granted a security interest to both Mr. T's and Talley in all the office equipment, furniture, service equipment, "inventory" and rental agreements owned, or thereafter acquired, by the purchasers, including all the proceeds derived therefrom. This security interest, however, was subordinated to all security interests previously granted and to future liens granted to secure purchase money indebtedness. In addition, Charles and Mary Sims and Jerrald and Nancy Dunaway, shareholders of the purchasing corporations, executed a guaranty agreement making each of them jointly and severally liable for the payment of the note. The March 8 sales agreement also contained certain covenants intended to insure prompt payment of the note. These required that (1) the purchasing corporations restrict their total indebtedness, exclusive of the note, to $3,250,000; (2) the Sims' limit their personal indebtedness to $250,000; (3) the purchasing corporations obtain a life insurance policy on the life of Charles Sims with Mr. T's named as creditor beneficiary (the face amount of the insurance *533 was the lesser of $1,000,000 or the maximum amount obtainable for a $3,000 annual premium); (4) the Sims and Dunaway families limit their aggregate salaries to $200,000; (5) Remco not open new stores so long as the balance due on the note exceeded $1,000,000; and (6) no dividends be paid or stock redeemed for the duration of the note. On July 29, 1974, Remco entered into a Revolving Loan and Security Agreement with General Electric Credit Corporation ("GECC"). This agreement provided Remco with a $750,000 line of credit bearing interest at the prime rate plus five percent. Any amount drawn under the line of credit was payable upon 30 days' notice or when the collateral fell below a certain level. In conjunction with the GECC agreement, Mr. T's and Talley agreed to subordinate their security interest in Remco's "inventory" in favor of GECC. They further agreed that Remco's note would not be assigned unless the assignee recognized GECC's superior interest in the "inventory." As additional security for its line of credit, GECC required the personal guarantees of Charles and Mary Sims. [11]
*534 On September 23, 1974, Mr. T's transferred an undivided three-fourths interest in the Remco note to its shareholders as part of its plan of liquidation. As of that date the note's unpaid balance was $2,025,833. Mr. T's distributed the remaining one-fourth interest in the note to its shareholders on March 4, 1975, at which time the unpaid balance was $1,749,583.30. Mr. T's dissolved prior to April 1, 1975. Petitioners Talley and Pack treated the note as having no ascertainable value on both of the distribution dates. Accordingly, they reported as income only those amounts of the principal collected in 1974 and 1975 in excess of their bases in Mr. T's stock. The 1974 and 1975 interest payments received by each of them were reported as ordinary income. The following chart represents a summary of Remco's financial statements both prior to and subsequent to its acquisition of Mr. T's assets. Remco's financial statements reflect an October 31 fiscal year. Action Industries
Remco
[12] 10/31/73 [12] 10/31/73 Current Assets
$ 69,485
$ 463,178
Investments
550
3,950
Property Assets (net
of accumulated depre-
ciation)
26,534
16,350
Other Assets
209
24,189
Total Assets
$ 96,778
$ 507,667
Current Liabilities
56,233
405,568
Long-term Debt
4,652
27,857
Stockholders' Equity
35,893
74,242
Total Liabilities and
$ 96,778
$ 507,667
Stockholders' Equity
*535 Remco
Remco
[13] 10/31/74 [13] 10/31/75 Current Assets
[14] $ 1,843,324 [14] $ 2,035,746 Investments
10,550
13,800
Property Assets (net
of accumulated depre-
ciation)
213,804
227,739
Other Assets
84,961
38,444
Total Assets
$ 2,152,639
$ 2,315,729
Current Liabilities
[15] 1,447,370 [16] 1,876,305 Long-term Debt
[17] 1,448,952 [18] 777,065 Stockholders' Equity
(743,683)
(337,641)
Total Liabilities and
$ 2,152,639
$ 2,315,729
Stockholders' Equity
*536 The deficit in Remco's 1974 stockholders' equity account resulted from a net loss in 1974 of $849,759. In 1975 Remco had net income of $406,042. The personal balance sheets of the guarantors of the Remco note indicate that as of December 31, 1974, Charles and Mary Sims had a net worth of $81,008, and as of October 31, 1973, Jerrald and Nancy Dunaway had a net worth of $93,434.62. Neither Mr. T's nor Mr. T's shareholders made any attempt to sell or assign the Remco note. Remco paid both interest and principal on its note on time from May 1974 through December 1975. On January 7, 1977, petitioners executed transferee agreements (Form 2045) with respect to the dissolution of Mr. T's Rental, Inc. Respondent determined deficiencies in Mr. T's income taxes of $22,852.97 in 1974 and $478,574 in 1975. These deficiencies resulted from respondent's determination that the $1,245,017.39 gain on the sale of Mr. T's "inventory" was subject to section 1245 recapture. Respondent further determined that petitioners were liable for these deficiencies as transferees of Mr. T's assets under section 6901. Respondent concedes that the extent of petitioners' collective transferee liability *537 is limited to the fair market value of the assets, i.e., the note, petitioners received on the liquidation of Mr. T's, plus interest as provided by law. Respondent determined the note's fair market value to be 90 percent of its outstanding principal on the distribution dates of September 23, 1974 and March 4, 1975. OPINION The first issue is the amount of depreciation required to be recaptured under section 1245 upon the section 337 liquidation sale of televisions and stereos by Mr. T's Rental, Inc. ("Mr. T's") to Remco Enterprises, Inc., and Action Industries, Inc. (hereinafter collectively referred to as "Remco"). Generally, a corporation is not taxed on the sale of property pursuant to a liquidation under section 337. There are, however, certain exceptions to this rule, one of which is section 1245. Sec. 1245(d); Clayton v. Commissioner,52 T.C. 911 (1969). Section 1245, in pertinent part, provides: SEC. 1245. GAIN FROM DISPOSITIONS OF CERTAIN DEPRECIABLE PROPERTY. *538 (a) General Rule.-- (1) Ordinary Income.--Except as otherwise provided in this section, if section 1245 property is disposed of during a taxable year beginning after December 31, 1962, the amount by which the lower of-- (A) the recomputed basis of the property, or (B)(i) in the case of a sale, exchange, or involuntary conversion, the amount realized, or (ii) in the case of any other disposition, the fair market value of such property, exceeds the adjusted basis of such property shall be treated as gain from the sale or exchange of property which is neither a capital asset nor property described in section 1231. Such gain shall be recognized notwithstanding any other provision of this subtitle. As applied to our facts, there is no dispute that the sale of Mr. T's assets to Remco was pursuant to a section 337 liquidation or that the televisions and stereos constituted "section 1245 property." Nor is there any dispute that the adjusted basis of the televisions and stereos (hereinafter referred to as "inventory") at the time of their sale was $486,602.61 or that the recomputed basis of the "inventory" at such time was at least $1,731,620. Rather, the controversy centers *539 on the amount realized for the "inventory." [19] This, in turn, depends upon the proper allocation of the contract price to the "inventory." The regulations promulgated under section 1245 provide that, in the case of a sale of both section 1245 property and non-section 1245 property, the amount realized shall be allocated between the section 1245 property and the non-section 1245 property in proportion to their respective fair market values. If the parties to the sale have adverse interests as to the allocation of the contract price between section 1245 property and non-section 1245 property, then any arm's-length agreement between them will generally establish the allocation. Sec. 1,1245-1(a)(5), Income Tax Regs.
Respondent asserts that the parties to the sales agreement, Mr. T's and Remco, agreed to allocate $1,731,620 of the contract *540 price to "inventory" and that the parties should be bound by this allocation. [20] Alternatively, respondent claims that petitioners failed to establish a proper allocation of the contract price to the "inventory" and, accordingly, respondent's allocation of $1,731,620 must stand. Under either argument, respondent's allocation would result in $1,245,017.39 of ordinary income to Mr. T's on account of the recapture provisions of section 1245. On the other hand, petitioners contend that the parties to the agreement never agreed to allocate $1,731,620 to the physical "inventory." Petitioners claim that Remco and Mr. T's agreed that the bundle of assets embodied in the term "inventory" was worth $1,731,620 and that this "bundle" was composed of (1) the physical, tangible "inventory" and (2) the intangible value derived from having the "inventory" in customers' homes immediately producing revenue, but that no agreement was reached as to how to allocate the total value of $1,731,620 into the component parts. Accordingly, petitioners dispute respondent's assertion that Mr. T's should be bound by the *541 $1,731,620 allocation. Petitioners further contend that the fair market value of Mr. T's physical "inventory" at the time of sale equaled its adjusted basis of $486,602.61 and, therefore, none of the "inventory" depreciation is subject to recapture because no gain was realized. [21]
Respondent attempts to invoke either the rule of Commissioner v. Danielson,378 F. 2d 771 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965), cert. denied 389 U.S. 858 (1967) (holding that a party can challenge the tax consequences of his agreement as *542 construed by respondent only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc.) or Ullman v. Commissioner,264 F. 2d 305 (2d Cir. 1959), affg. 29 T.C. 129 (1957) (holding that when parties to an agreement have set out covenants not to compete in the contract and have given them an assigned value, strong proof must be adduced by them in order to overcome values assigned in the agreement). Both of those cases involved written agreements in which specific amounts were expressly allocated to covenants not to compete. 21a In the case before us here the parties did not make an allocation (in this case to televisions and stereos held for rent) in the executed written agreement. An allocation was proposed in Addendum No. 2, but the parties never executed that addendum. Consequently neither the quantum of proof specified in Danielson or in Ullman is applicable here. Instead, petitioners have the ordinary *543 burden of persuasion (by a preponderance of the evidence) in this case. [22] See Maryland National Bank v. Commissioner,33 T.C.M. 936, 43 P-H Memo. T.C. par. 74,209 (1974), affd. percuriam38 A.F.T.R. 2d 76-5103 (4th Cir. 1976) and Carey Advertising, Inc. v. Commissioner,31 T.C.M. 497, 41 P-H Memo. T.C. par. 72,124 (1972). After carefully considering the evidence, we conclude that petitioners have established that the $1,731,620 allocated to "inventory" did not reflect the value of the tangible physical "inventory" on the date of sale, determined without regard to intangible elements such as customer contracts, goodwill or customer lists. *544 Two considerations lead to this conclusion. Initially, the method used to derive the $1,731,620 indicates that such amount did not represent an approximation of the "inventory's" fair market value. Sims, Remco's president, suggested this valuation to the accountant based on the replacement cost of the "inventory." He then discounted this replacement value by an arbitrary amount to reflect his perception of how well the purchased "inventory" reflected current consumer preferences and current innovations. Sims' mode of valuation, however, did not consider the age or the condition of the "inventoried" items. The absence of these considerations makes his valuation suspect. Second, on the facts presented it is incredible that the "inventory's" fair market value was anywhere near $1,731,620. This amount represents approximately 89 percent of replacement cost. At the time of sale, the typical unit of "inventory," whether a stereo or television, was one-year old. During that year, 90 to 95 percent of the units were in the homes of Mr. T's customers. These customers generally consisted of transient individuals who were unable or unwilling to obtain financing to purchase these items *545 elsewhere. When we consider the character of Mr. T's customers, the susceptibility of televisions and stereos to undergo technological changes and the potentially short duration of any given rental, 22a in addition to the age of the average unit, we are forced to conclude that the fair market value of the "inventory" on the date of sale was substantially less than 89 percent of its replacement cost. Petitioners contend that the fair market value of the "inventory" was equal to its adjusted basis of $486,602.61. No evidence, however, was presented that would relate these book figures to the fair market value of the "inventory." [23] See Art Metal Construction Co. v. Commissioner,4 B.T.A. 493, 498 (1926). *546 Notwithstanding our rejection of both petitioners' and respondent's valuations, we find that petitioners have introduced sufficient evidence to permit us to reach a fair determination of the "inventory's" value. This determination is based on the nature of the "inventory," the nature of Mr. T's operation, the average age of the "inventory," and the characteristics of Mr. T's customers. On the basis of the record as a whole, which is admittedly not as full as would be desirable, we find that the "inventory" had a fair market value of $900,000 on April 1, 1974. Therefore, $413,379.79 of depreciation previously deducted is subject to section 1245 recapture. Our holding that the amount realized by Mr. T's for its "inventory" was $900,000 creates a potential "unallocated" amount of $831,620. There are at least three explanations of what intangibles this amount represents: (1) Mr. T's and Talley's covenants not to compete with Remco; (2) the rental agreements in existence at the time of the sale; and (3) goodwill or going concern value. None of the contract price was allocated to the first two and only $27,656 was allocated to goodwill. For purposes of this decision, it is unnecessary *547 to characterize or allocate the unallocated amount. The second issue is he fair market value of the Remco promissory note distributed to Mr. T's shareholders. [24] Petitioners contend that the entire note was worth $500,000 with presumably three-fourths of its value, or $375,000, assigned to the undivided three-fourths interest distributed on September 23, 197 and one-fourth of its value, or $125,000, assigned to the March 4, 1975 distribution. [25] On the other hand, respondent asserts that the fair market value of the note was 90% of its unpaid balance on each of the distribution dates. [26]
*548 The burden is on petitioners to prove the notes did not have the market value attributed to them by respondent. Castner v. Commissioner,30 T.C. 1061, 1072-1073 (1958); Rule 142(a), Tax Court Rules of Practice and Procedure. To meet their burden, petitioners presented one witness and introduced Remco's financial statements together with those of the note's guarantors. After listening to petitioners' witness, we find his testimony is entitled to little, if any, weight. The witness was employed as a regional supervisor of a large finance company whose general business entailed the financing of the day-to-day operations of various companies. The duties of the witness did not encompass buying or selling notes or financing the acquisition of rental businesses, nor did the witness have any experience in these areas. Although he was familiar with both Mr. T's and Remco, this familiarity alone does not qualify the witness to render an opinion on the value of the note. In sum, the witness was a novice in making valuations of this kind and his testimony is weighed accordingly. *549 Cf. Jones v. United States,387 F. 2d 1004, 1008 (10th Cir. 1968) (witness not permitted to testify after admitting he had never evaluated an insurance company before). Even if the witness possessed more seasoned qualifications, we would not have accorded his testimony much, if any, weight due to the valuation method he utilized and his failure to take into account certain information. The witness assigned a $500,000 value to the note. He derived this figure by estimating how much he would hypothetically authorize his employer to lend to Talley based on Talley's net worth, his paying habits and his interest in the Remco note. In other words, the witness valued the note based on the lender's, i.e., Talley's, ability to repay a loan rather than focusing on the maker's, i.e., Remco's, financial condition. The witness' limited testimony indicated that (1) he was not familiar with Remco's post-1973 financial statement, (2) he was not familiar with the terms of the GECC agreement, (3) he did not know that Remco had been making timely payments on the note, and (4) he did not know how much "inventory" was actually transferred from Mr. T's to Remco. Moreover, *550 the witness considered Mr. T's security interest in Remco's assets to be of minor importance in valuing the note. This view was based on his opinion that rental companies like Remco experience an annual loss ratio of 50 percent, i.e., one out of every two rental units disappears within a given year. Yet on cross-examination it was revealed that the witness did not know Remco's actual loss ratio nor had he ever inspected Remco's assets or estimated their realizable value. The failure of petitioners' witness to consider the financial condition of Remco on the distribution dates, the timeliness of Remco's payments on the note and the security interest in Remco's assets including the subordinated security interest in the "inventory", warrants our assigning no significant weight to his valuation. Alternatively, petitioners rely on Remco's financial statements and those of the note's guarantors to support their $500,000 valuation. Petitioners contend that an examination of the financial position of Remco on the distribution dates, GECC's prior security interest in the "inventory", and the financial position of the guarantors, demonstrates that respondent's determination is unreasonable *551 and, therefore, we should accept the $500,000 value assigned by their witness. Petitioners assert that Remco's 1974 and 1975 balance sheets reflect Remco's financial condition on the note's distribution dates. Using these account balances, petitioners calculate that the note was substantially undercollateralized on both distribution dates especially after considering GECC's superior security interest in the inventory and the potential problems and expense of repossessing and selling rental units scattered in homes throughout the country. Moreover, the limited resources of the personal guarantors do not eliminate this undercollateralization. According to petitioners, this undersecured situation coupled with the substantial loss sustained by Remco in 1974 is sufficient proof that the note was not worth 90% of its face value. There are, however, several problems with petitioners' approach. Initially, petitioners' calculations do not accurately reflect the value of the collateral. Petitioners use the book values, rather than the fair market values, of Remco's assets in their calculations. Moreover, petitioners assume that on default the Remco assets would be liquidated on an *552 individual basis to satisfy the payment of the note. The note, however, is essentially secured by Remco's entire operations and conceivably Remco could be sold as a going concern to satisfy the note. Considering that the selling price of Mr. T's assets was significantly more than the aggregate of their book values, it is plausible that the selling price of Remco's assets, as a going concern unit, would be well above their book values. [27]
Second, Remco's 1974 loss does not accurately reflect the results of its operations. It appears that most, if not all, of this loss is attributable to the depreciation of the "inventory" acquired from Mr. T's. Remco depreciated the cost of this "inventory" using a 12-month life. Assuming Remco assigned the same value, $1,731,620, to Mr. T's "inventory" as did Mr. T's, [28] then 7/12's of this value, or $1,010,112, was expensed in 1974. When this amount is contrasted with the $486,602 adjusted basis of the "inventory" in the hands *553 of Mr. T's it becomes clear that much, if not all, of this "loss" was a one-shot write-off having no effect on Remco's ability to meet its obligations under the note. Given the "artificial" nature of the 1974 loss, it is not surprising that in 1975 Remco rebounded and reported earnings of $406,042engravers, it is this latter figure which is more representative of the profitability of the combined operations of Mr. T's and Remco since 1975 was the first full year in which these operations were combined. [29]
Petitioners contend that Remco's 1974 loss was attributable to its inability to locate a large portion of Mr. T's "inventory" thereby necessitating its replacement. The facts, however, belie this explanation. In 1974 Remco reported a $132,518 loss from missing merchandise. This amount is not disproportionate to the $93,227 reported by Remco in 1975 or the $203,259 reported by Mr. T's in 1973. Third, petitioners ignore two significant facts in evaluating the note, namely, *554 the timeliness of Remco's payments and the term of the note. The record indicates that Remco paid both interest and principal on a timely basis from the date of the note's execution through December 1975. Moreover, there is no evidence in the record of any subsequent delays or defaults in Remco's payments. This payment record cannot be ignored. After all, the valuation of Remco's note is merely an attempt to estimate the market's evaluation of the probability that Mr. T's shareholders will be paid its face amount. See Castner v. Commissioner,30 T.C. 1061, 1072-1073 (1958); Phillips v. Commissioner,24 B.T.A. 98, 102 (1931). A low discount is further supported by the relatively short four-year term of the note. Not only is the holder's risk positively correlated with the length of the note, i.e., the shorter the term the less risk to the holder, but its short term also reflects certain expectations of the parties. It appears obvious that both Mr. T's and Remco anticipated that their combined operations could generate sufficient income to service *555 the note in the four-year period. This expectation was realistic considering the profitability of both companies prior to their combination and their patterns of growth up to the date of sale. Indeed, if the parties believed these goals were unattainable they could have easily provided for a longer payout period either in the original agreement or in a subsequent addendum. Moreover, our analysis of Remco's earnings subsequent to the acquisition of Mr. T's does not indicate that these expectations became unrealizable in the short span between April 1974 and the distribution dates. The combination of the parties' expectations at the time of the note's execution and Remco's subsequent ability to fulfill those expectations by making timely payments, tends to support a low discount. It is obvious from the relative sizes of Remco and Mr. T's that Remco intended to use its future earnings to finance its acquisition of Mr. T's. Since in a deal like this the parties generally look to the earning prospects of the purchaser rather than any collateral as the primary source of payments, this should also be our focus. Petitioners have not introduced sufficient, cogent evidence to demonstrate *556 Remco's inability to generate future earnings to service the note. However, it does not require very extensive familiarity with commercial realities to recognize that greater risks inhere in a case where repayment depends upon hoped-for but by no means guaranteed future earnings than where there is solid security of existing marketable assets. We do not find it credible that a note subject to such risks could be sold at 90 percent of par in the market. After carefully considering the record in this case, the testimony of petitioners' witness, petitioners' arguments concerning Remco's financial condition, and the character of the Remco note including its assignability, we conclude that the value of the Remco note on the distribution dates was 80 percent of the note's unpaid balance on those dates. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners have been consolidated herewith for purposes of trial, briefing and opinion: J. Ernest Talley, Transferee, docket no. 10942-77; J. Ernest Talley and Mary Ann Talley, docket no. 10943-77; Sharon K. Pack, docket no. 10944-77; Robert A. Walton, Transferee, docket no. 11081-77; and V. B. May, Transferee, docket no. 11191-77.↩
2. Although the total transferee liability is listed next to each transferee, respondent correctly recognizes that each transferee is jointly and severally liable only to the extent of the fair market value of the assets received upon the liquidation of Mr. T's Rental, Inc., plus interest as provided by law. For three of the transferees, Sharon K. Pack, Robert A. Walton and V. B. May, the alleged deficiencies exceed the fair market value of their liquidation proceeds.↩
3. All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue.↩
4. In 1972 Mr. T's reported net income of $140,780 on gross revenues of $3,813.854. A year later net income fell to $65,089 but gross revenues increased to $4,474,849.↩
5. The sales agreement also contained Mr. T's and Talley's covenants not to compete in the business of renting home appliances anywhere in the continental United States for four years. The sales agreement expressly provided that no part of the selling price was attributable to these covenants.↩
6. There is an unexplained $80 difference between the amount shown on the addendum and the amount derived from Sims' recommendations. n6a There is an unexplained $20 difference between this total and the total consideration provided for in the March 8 sales agreement.↩
7. The adjusted basis of all the assets sold by Mr. T's to Remco, including the "inventory", was $698,893. ↩
8. This represents the difference between the $1,731,620 value assigned to the "inventory" and its adjusted basis of $486,602.61.↩
9. The settlement agreement dated October 31, 1975, reduced the note by $100,000. ↩
10. The monthly payments were $46,041.67, plus interest.↩
11. This required the approval of Mr. T's since the sales agreement had originally limited the Sims' personal indebtedness to $250,000.↩
12. Unaudited and unconsolidated. ↩
13. Audited and consolidated--includes Remco, Action Industries, and Mr. T's. ↩
14. Includes $1,335,656 of "inventory" in 1974 and $1,536,135 of "inventory" in 1975; for depreciation purposes, Remco used an 18-month life for new "inventory" and a 12-month life for used "inventory," i.e.,↩ the "inventory" acquired from Mr. T's. 15. Includes a $633,270 balance on the GECC lines of credit and $575,715 as the current portion of the note held by Mr. T's. ↩
16. Includes a $750,000 balance on the GECC line of credit and $555,921 as the current portion of the note held by Mr. T's. ↩
17. Includes approximately $1,400,000 representing the long-term portion of the note held by Mr. T's. ↩
18. Includes $774,792 representing the long-term portion of the note held by Mr. T's.↩
19. If the amount realized is less than $1,731,620 then the recapturable gain on the "inventory" sale will be determined by the difference between the amount realized and the adjusted basis of $486,602.61, i.e., the gain realized. Sec. 1245 (a) (1)↩.
20. Respondent views the unexecuted Addendum No. 2 as part of the sales agreement.↩
21. Respondent does not argue that the difference, if any, between the $1,731,620 and the amount allocable to "inventory" is attributable to other section 1245 property sold to Remco. Therefore, we assume that any difference is attributable to non-section 1245 property. This invokes the application of section1.1245-1(a)(5), Income Tax Regs. See BASF Wyandotte Corp. v. Commissioner,62 T.C. 704, 718 (1974), affd. 532 F. 2d 530↩ (6th Cir. 1976).
21a. See Lazisky v. Commissioner,72 T.C. 495↩ (1979), a recent case involving the rules to be applied in situations of this type. 22. Petitioners contend that if they prove respondent's determination has no rational basis then they are relieved of the burden of proving the correct value of the "inventory" and that we must determine the correct value without regard to the presumption of correctness to which respondent's determination is normally entitled. Respondent based his determination of the "inventory's" value on information provided by Mr. T's tax returns. Reliance on such records is clearly not irrational and, accordingly, the burden of proof remains with petitioner. Rule 142(a), Tax Court Rules of Practice and Procedure.↩
22a. The television and stereo units were rented on a weekly, renewable basis. This short-term rental is conducive to a higher turnover of renters which leads to greater wear and tear on the units.↩
23. The stipulation filed in this case contained "[a] true and correct photocopy of an Engineering And Valuation Report dated April 2, 1976, in regard to Mr. Ths Rental, Inc., for the years 1973 and 1974 which was prepared by respondent's Valuation Engineer, Greg VanDerWerff." The purpose of this report was to estimate the fair market value of Mr. T's "inventory" as of April 1, 1974. Petitioners wanted this Court to consider the report as the opinion of an expert witness. At trial, however, respondent objected to, among other things, the foundation of the report and moved that it be stricken from the record. The motion was granted. Petitioners did not intend to call the valuation engineer who prepared the report to testify nor were they surprised that respondent did not call him. Petitioners, however, were warned at trial that if they wanted to use the engineer as an expert, they had to bring him into Court and qualify him as an expert. Petitioners did not heed this warning. Petitioners argue that the form of the stipulation precludes respondent from objecting to this report for any reasons other than materiality and relevance. Petitioners base their argument on the following language taken from the preface of the stipulation: The parties hereby stipulate and agree that for the purpose of these cases the following facts and exhibits attached hereto and made a part hereof may be taken as true, subject to the rights of the parties to introduce other and further evidence not inconsistent with this stipulation and preserving the parties' rights to object, at the time of trial, to any and all portions of said stipulation and attached exhibits as they may deem to be irrelevant or immaterial. Regardless of the restrictions the above language may impose on the potential objections to other stipulated matters, appraisal and valuation reports warrant special consideration. The experts behind these reports act as advisors to the Court. See Estate of Williams v. Commissioner,256 F. 2d 217, 219 (9th Cir. 1958). In this posture, it is important that the expert's credentials as well as his presence be made available to the Court. The Court cannot be left to speculate as to the qualifications of its advisors, see Jones v. United States,387 F. 2d 1004 (10th Cir. 1967); Fed. R. Evid., Rule 702; nor as to the bases of its advisors' opinions. Moreover, such experts must be made available for purposes of cross-examination. See Montgomery Bros. & Co. v. Commissioner,5 B.T.A. 258, 260 (1926); Rowland v. Commissioner,5 B.T.A. 770, 771 (1926); Fed. R. Evid., Rule 705. Since petitioners have neither qualified the valuation engineer as an expert nor made him available to the Court or opposing counsel, we sustained respondent's objection as to the admissibility of the Engineering and Valuation Report. Even if the report were admitted in evidence, we are of the opinion it would be entitled to little, if any, weight due to the unavailability of anyone to explain its content. See Harris v. Commissioner,46 T.C. 672, 674 (1966); Kilburn Lincoln Machine Co. v. Commissioner,2 B.T.A. 363, 364 (1925). Although petitioners have not argued that the engineer's valuation report is admissible as a vicarious admission by his employer, the IRS, we have considered such a possibility. The issue is whether the contents of an intra-organizational report prepared by an employee for his employer speaks for the employee alone or for his employer as well. While there appears to be a split of authorities on this issue, see McCormick, Law of Evidence (2d ed. 1972), at 642, we believe the better view is to deem these reports not to be admissions. Our view has been succinctly stated elsewhere: Where the agent makes a report to the principal or to another agent, and all that appears is that the principal had authorized the agent to make such a report, a statement in the report is not the principal's and is not an extrajudicial admission of the principal. * * * The principal gave his agent limited authority to investigate a topic and report. Authority merely to report to a principal or a fellow agent is not authority to commit the principal. Otherwise every time a principal asked an agent to look into the history of an accident, or an invention or the state of competition, the principal would be held to be an underwriter of the report and to guarantee its trustworthiness. But the principal did not intend to vouch for it sight unseen. The principal was not ready to make the statement his own or to give it to the world. * * * [Citations omitted.] United States v. United Shoe Machinery Corp.,89 F. Supp. 349, 352 (D. Mass. 1950). See also Morgan, the Rationale of Vicarious Admissions, 42 Harv. L. Rev. 461, 463 (1929). There is no evidence in this case that respondent took any action on the engineer's report or in any way adopted it as his own. In fact at trial respondent expressly stated that he did not use the report. Moreover, there is no evidence that the report was originally intended or used for any extra-organizational purposes. On these facts, we conclude that the engineer's report is not admissible as an admission by respondent.↩
24. The resolution of this issue will determine the extent to which petitioners Talley and Pack must recognize gain on the distribution of the note and the extent to which all the petitioners are liable as transferees of Mr. T's. ↩
25. Petitioners Talley and Pack have evidently abandoned the position reflected on their tax returns, i.e.,↩ that the notes had no ascertainable value. 26. The unpaid balance on September 23, 1974, was $2,025,833.32. Respondent presumably values the September 23 distribution at 75% X 90% X $2,025,833.32. The unpaid balance on March 4, 1975, was $1,749,583.30 which respondent presumably values at 25% X 90% X $1,749,583.30.↩
27. To the extent that the former assets of Mr. T's are reflected on Remco's books at or near their fair market values, this would tend to reduce the premium over book value that Remco would be able to attract.↩
28. This assumption appears valid considering that this amount originated with, and was recommended by, Remco's president. ↩
29. The 1974 Remco results reflect only seven months of combined operations.↩